2 U.S. 346 (____)
2 Dall. 346
The UNITED STATES
versus
VIGOL.
Supreme Court of United States.

PATTERSON, Justice.
The first point for consideration, is the evidence, which has been given to establish the case stated in the indictment; the second point turns upon the criminal intention of the party; and from these points (the evidence and intention) the law arises.
With respect to the evidence, the current runs one way: It harmonizes in all its parts: It proves that the prisoner was a member of the party, who went to Reigan's house, and, afterwards, to the house of Wells, in arms, marshalled, and arrayed; and who, at each place, committed acts of violence and devastation.
With respect to the intention, likewise, there is not, unhappily, the slightest possibility of doubt: To suppress the Office of Excise, in the Fourth Survey of this State; and particularly, in *347 the present instance, to compel the resignation of Wells the Excise Officer, so as to render null and void, in effect, an act of Congress; constituted the apparent, the avowed, object of the insurrection, and of the outrages which the prisoner assisted to commit.
Combining these facts, and this design, the crime of High Treason is consummate in the contemplation of the Constitution and Law of the United States.
The counsel for the prisoner have endeavoured, in the course of a faithful discharge of their duty, to extract from the witnesses some testimony, which might justify a defence upon the ground of duress and terror. But in this they have failed; for the whole scene exhibits a disgraceful unanimity; and, with regard to the prisoner, he can only be distinguished for a guilty pre-eminence in zeal and activity. It may not, however, be useless on this occasion, to observe, that the fear, which the law recognizes as an excuse for the perpetration of an offence, must proceed from an immediate and actual danger, threatening the very life of the party. The apprehension of any loss of property, by waste, or fire; or even an apprehension of a flight or remote injury to the person, furnish no excuse. If, indeed, such circumstances could avail, it would be in the power of every crafty leader of tumults and rebellion, to indemnify his followers, by uttering previous menaces; an avenue would be forever open for the escape of unsuccessful guilt; and the whole fabric of society must, inevitably, be laid prostrate.
A technical objection has, also, been suggested in favor of the prisoner. It is said, that the offence is not proved to have been committed, on the day, nor the number of the Insurgent party to be so great, as the indictment states. But both these exceptions, even, if well founded in fact, are immaterial in point of law. The crime is proved, and laid to have been committed, before the charge was presented; and whether it was committed by one hundred, or five hundred, cannot alter the guilt of the defendant. If, however, the Jury entertain any doubt upon the matter, they may find it specially.
Verdict, GUILTY.[*]
NOTES
[*] The Court having waited about an hour for the Jury ('till half past ten o'clock at night) adjourned 'till 11 o'clock the next morning. Just after the adjournment took place, the Jury requested to fee Foster's Crown Law and the Acts of Congress, which, by consent, were accordingly sent to them. I am told, that they remained together 'till between 3 and 4 o'clock in the morning, when they wrote, signed, and sealed up, their verdict and adjourned. On the next morning (the 23d of May 1795) they appeared at the bar; and, being called over, offered the written verdict, sealed up, to the Clerk. But THE COURT said, that the paper could not be received. The foreman then pronounced the verdict, viva voce, and again offered the written verdict; but THE COURT repeated, "We cannot open, or receive it." Nothing was said, publicly, of the Jury's having adjourned. The defendant was eventually pardoned.