**GILLARS v. UNITED STATES.**
No. 10187.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 9, 1950.

Decided May 19, 1950.

Mr. James J. Laughlin, Washington, D. C., for appellant. Mr. William E. Owen, Washington, D. C., also entered an appearance for appellant.

Mr. J. Frank Cunningham, attorney, Department of Justice, Washington, D. C., with whom Messrs. George Morris Fay, United States Attorney, Washington, D. C., and John M. Kelly, Jr., Special Assistant to the Attorney General, were on the brief, for appellee.

Before CLARK, WILBUR K. MILLER and FAHY, Circuit Judges.

FAHY, Circuit Judge.

Appellant was convicted of treason in a jury trial in the United States District Court for the District of Columbia. Treason alone of crimes is defined in the Constitution, as follows:

"Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. * * *" U.S. Const. Art. III, § 3.[1]

The First Congress, in 1790, provided by statute,

" * * * That if any person or persons, owing allegiance to the United States of America, shall levy war against them, or shall adhere to their enemies, giving them aid and comfort within the United States or elsewhere, and shall be thereof convicted, on confession in open court, or on the testimony of two witnesses to the same overt act of the treason whereof he or they shall stand indicted, such person or persons shall be adjudged guilty of treason against the United States, * * *." 1 Stat. 112 (1790).

The indictment alleges that appellant was born in Maine, was a citizen of and owed allegiance to the United States, that within the German Reich, after December 11, 1941, to and including May 8, 1945, in violation of her duty of allegiance she knowingly and intentionally adhered to the enemies of the United States, to wit, the Government of the German Reich, its agents, instrumentalities, representatives and subjects with which the United States was at war, and gave to said enemies aid and comfort within the United States and elsewhere, by participating in the psychological warfare of the German Government against the United States. This participation is alleged to have consisted of radio broadcasts and the making of phonographic recordings with the intent that they would be used in broadcasts to the United States and to American Expeditionary Forces in French North Africa, Italy, France and England. The indictment charges the commission of ten overt acts, each of which is described, and, finally, that following commission of the offense the District of Columbia was the first Federal Judicial District into which appellant was brought.

Eight of the ten alleged overt acts were submitted to the jury. A verdict of guilty was returned, based on the commission of overt act No. 10, which is set forth in the indictment as follows:

"10. That on a day between January 1, 1944 and June 6, 1944, the exact date being to the Grand Jurors unknown, said defendant, at Berlin, Germany, did speak into a microphone in a recording studio of the German Radio Broadcasting Company, and thereby did participate in a phonographic recording and cause to be phonographically recorded a radio drama entitled "Vision of Invasion," said defendant then and there well knowing that said recorded radio drama was to be subsequently broadcast by the German Radio Broadcasting Company to the United States and to its citizens and soldiers at home and abroad as an element of German propaganda and an instrument of psychological warfare."

We now discuss the several matters raised by appellant as grounds for reversal.

**I**
**The Sufficiency and Weight of the Evidence**

Appellant contends the verdict was contrary to the evidence and to the weight of the evidence. The argument runs as follows: The indictment charged that at various times appellant spoke into a microphone and her voice was later sent over the radio; that two of the ten overt acts of this

---

1. The reason the framers of the Constitution defined the crime of treason in the Constitution itself was not because of the gravity of the crime, considered alone. Due to the abuses which had surrounded prosecutions for treason they did not wish this crime to consist in the new nation of any conduct other than what the Constitution itself described. This is shown not only by the history and background of the provision (See Cramer v. United States, 325 U.S. 1, and particularly pages 8–35, 65 S.Ct. 918, 89 L.Ed. 1441, but it is indicated by the phraseology of the definition—"shall consist only".

character were withdrawn, leaving eight for jury consideration; that of these she was acquitted of seven; that she admitted speaking into the microphone and sending her views over the radio but denied any intention to betray; and that therefore the jury, having in mind this admission, concluded there was no intent to betray in the case of seven overt acts. From this it is argued that the finding of treasonable intention as to one overt act could not have been made consistently with acquittal of these other overt acts.

If, however, there is sufficient evidence to support the verdict of guilty based on the commission of the tenth overt act alone we may not reverse even were we of opinion that the evidence was equally strong to support a conviction based on other alleged overt acts as to which appellant was acquitted. A jury verdict need not be consistent.

"Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment. Latham v. The Queen, 5 Best & Smith 635, 642, 643; Selvester v. United States, 170 U.S. 262, 18 S.Ct. 580, 42 L.Ed. 1029. * * *" Dunn v. United States, 1931, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356, 80 A.L.R. 161.

The evidence was sufficient to support the verdict on the tenth overt act There was before the jury evidence from which they could find the following: Appellant was a native born citizen of the United States and therefore owed allegiance to the United States;[2] in 1940 she was thirty-nine years of age; she had studied dramatics and had been employed in the United States as an actress; she left the United States in 1933, and took up residence in Berlin in 1934; on May 6, 1940, she was employed there by the German Broadcasting Company as announcer on the European Services; within a few months after this employment she was made mistress of ceremonies of the European Services; in 1941 she took part also in an overseas service program broadcast to the United States; the United States declared war on Germany

December 11, 1941; the German Radio Broadcasting Company was a tax-supported agency of the German Government; it consisted of two main branches, the Home Branch and the Foreign Branch; the Foreign Branch in turn consisted of the European Service and the Overseas Service; the purpose of the broadcasts by the Foreign Branch was to disseminate to the Armed Forces and civilians of the United States and her allies propaganda along lines laid down by the German Propaganda Ministry and the Foreign Office to aid Germany and to weaken the war effort of the nations at war with her; daily conferences were held among Goebbels, head of the Ministry of Public Enlightenment and Propaganda of the German Government, and representatives of the Foreign Office to formulate propaganda lines; these were followed by conferences of the Director of the Foreign Branch with the officials of the Overseas Service about the propaganda lines to be pursued; the employees of the Overseas Service followed the propaganda instructions then announced; the lines of propaganda for broadcast to the citizens and Armed Forces of the United States were that Germany was superior in various ways; she was fighting against Communistic domination of the world; the United States was improperly influenced to enter and remain in the war by Jewish interests; German fighting forces were superior; Germany had secret military weapons such as the V-1 and V-2 rockets; an attempted invasion of Germany would be disastrous; the United States should not oppose Germany in its fight to save Christianity and world salvation from the Communists; the President would sell his country to the Russians and was improperly influenced by Jewish advisers; the people of the United States should not follow the policy of the war effort of their Government; the war was a British war.

The jury on the evidence could further find that the broadcasts consisted often of the transmission of programs previously recorded on phonographic discs; that the appellant participated in the making of such

2. We discuss separately under Part XIV, infra, the question of allegiance.

recordings; that she was paid by the German Radio Broadcasting Company a stipulated amount for each performance in which she participated; that she became the highest paid performer on the Overseas Service with a record of a large number of live broadcasts and recorded programs with a salary more than double that of her superior.

Further, the evidence enumerates the large number of programs which appellant recorded, evidencing active participation in the propaganda activities; that this included, in 1943, participation in the recordings of messages of prisoners in camps and prison hospitals transmitted to the United States beginning in December 1943; that in making these recordings appellant was accompanied to the camps and hospitals by radio and sound technicians from the German Radio Broadcasting Company; that a high official of the company and of the Foreign Office made arrangements for interviews at camps and hospitals but the actual interviews were conducted by appellant herself; that she passed out cigarettes to the soldiers and told them she was recording their messages to be sent home as part of the service of the International Red Cross; that the recordings were edited and as edited were re-recorded, and the final recordings were examined and approved for transmission to the United States; that particular information was recorded to attract large audiences in the United States; that appellant was in Paris in August 1944 making recordings of messages of American prisoners of war; that she fled the fifteenth of the month as American troops closed in on the city, which was captured in the following days, and when the fall of Berlin was imminent she went into hiding under an assumed name to escape capture by United States forces.

As to the overt act No. 10, on the basis of which she was convicted, three witnesses, Schnell, Haupt and von Richter, testified to her participation in the recording of *Vision of Invasion* and she admits so doing. This program was a radio play of an hour's length broadcast in the month before the Allied invasion of Europe. The scenes alternated between soldiers on a ship in the invasion and the home of an American soldier. The ship is sunk, the soldier is killed and he appears in a dream of his mother. The general theme is expressed in the following colloquy between the American mother and father:

"Mother: But everyone says the invasion is suicide. The simplest person knows that. Between seventy and ninety percent of the boys will be killed or crippled for the rest of their lives.

"Father: What can we do about it?

"Mother: Bah. We could have done a lot about it. Have we got a government by the people or not? Roosevelt had no right to go to war."

Witnesses who participated in the broadcast testified that the purpose was to prevent the invasion of Europe by telling the American people and soldiers that an attempted invasion would be risky with respect to the lives of the soldiers. It was to show "Americans that an invasion would be a very costly and daring undertaking."

In the light of the uncontradicted evidence of her participation in the recording of *Vision of Invasion,* testified to by more than two witnesses, as a part of her employment by an agency of the German Government, and the evidence as to the nature and purpose of this employment, of the intended use of the recordings and programs, the evidence of her citizenship, and the fact of war between the United States and Germany, we hold that the evidence furnished an adequate basis for the jury to find that appellant, while owing allegiance to the United States, adhered to the enemy, giving such enemy aid and comfort, and that this was done knowingly and with the intention of aiding the enemy in the war in which it was then engaged with the United States. Furthermore, we find no necessary inconsistency between the jury's conviction on overt Act No. 10 and their acquittal on others. They might reasonably have distinguished between the nature of *Vision of Invasion* and other recordings.

## II
### The Question of the Competency and Credibility of Certain Witnesses

(A) As a subsidiary to her attack on the sufficiency of the evidence appellant contends that the witness Schnell, who was one of three who testified to her participation in the recording of *Vision of Invasion*, was an incompetent witness because he stated that he did not believe in the God of the Bible. He also testified that he did not believe in rewards or punishments after death. It appears from his full statement, set forth in the margin,[3] that he recognized a right and duty of society to force members to speak the truth. He was permitted to testify on affirmation.[4]

The D.C.Code, Title 14, Section 101, reads as follows:

"All evidence shall be given under oath according to the forms of the common law, except that where a witness has conscientious scruples against taking an oath, he may, in lieu thereof, solemnly, sincerely, and truly declare and affirm; * * *"

The Government contends that Schnell affirmed in accordance with this provision. We read the permission to affirm because of conscientious scruples against taking an oath to apply to one who believes in God but does not believe in oath-taking in court. The witness Schnell was not of that character. He did not believe in the God before whom an oath is taken "according to the forms of the common law", Who is indeed the God of the Bible. United States v. Lee, C.C.D.C.1834, 26 Fed.Cas. page 908,

No. 15,586; United States v. Kennedy, C.C.D.Ill.1843, 26 Fed.Cas. page 761, No. 15,524; Wakefield v. Ross, C.C.D.R.I.1827, 28 Fed.Cas. page 1346, No. 17,050; Anonymous, 1839, 1 Fed.Cas. page 999, No. 446. The early common law rule, and therefore the rule which at an earlier period would have prevailed under the Code might well have rendered Schnell incompetent. But the Code must now be read with Rule 26 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., which provides, *inter alia*:

"* * * competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

A fair reading together of the Code and the Rule leads to the conclusion that the common law rule in the District of Columbia is to be interpreted now in the light of reason and experience. This brings into the area of competence witnesses who were under disability under the older criteria. For example, in Rosen v. United States, 1917, 245 U.S. 467, 38 S.Ct. 148, 62 L.Ed. 406, the Supreme Court in substance held that the former common law rule disqualifying criminals from being witnesses could no longer be followed; conviction of crime will be considered in testing the credibility of a witness but will not exclude him from the stand. See, also, United States v. Peterson, D.C.E.D.Pa.1938, 24 F.Supp. 470; United States v. Segelman, D.C.W.D.Pa.1949, 83 F.Supp. 890. In Gantz

3. His statement is as follows:
"I do not believe in the God of the Bible. I am, on the contrary, hoping and trying to sense Deity as much greater, as much superior than the Christian creed seems to allow with its anthropomorphic postulate: Man has been created to the image of God. To me such a sentence, when I recollect what I have seen and experienced of man, sounds almost blasphemous; so infinitely grander would I wish to see Deity.

"On the other hand, I recognize the right and the duty society has to furnish some means of being able to enforce members of its community to speak the truth. Such seems to me to be absolute-

ly endorsed in the words of the affirmation, that the law of the United States prescribes for such as are not able to swear an oath founded on Christian creed. I heard this formula today for the first time. I found no restraint in thus affirming. I actually did so."

4. The form of affirmation appears in the following excerpt from the record:
"The Deputy Clerk. Do you solemnly affirm and declare the testimony you shall give to the Court and jury in this case now on trial will be the truth, the whole truth, and nothing but the truth, and this you do under the pain and penalty of perjury?
"The Witness. I do."

v. State, 1916, 18 Ga.App. 154, 88 S.E. 993, 994, a similar rationale was applied where the witness disclaimed any belief in God. The court said:

"* * * The sufficiency of the test as to the competency of a witness is necessarily largely a matter of judicial discretion * * *.

"* * * In our view it is not essential to the competency of a witness that he shall know where he will go after death. Although lack of faith on this subject might affect his credit with the jury, it would not disqualify him from being a witness. * * *".

The course of change is traced in Underhill, Criminal Evidence, 4th Ed. Ch. 28. See, also, Wigmore on Evidence, 3rd Ed. Vol. VI, § 1816 et seq. Even therefore if we assume that the Code provision is a test of competency and not merely a prescription of the sanction under which one shall testify, it does not, when read with Rule 26, exclude as incompetent the non-believer in the God of the Bible.

We note that the affirmation in this case was not in the words of the Code, "* * * he may, in lieu thereof, solemnly, sincerely, and truly declare and affirm;" but such an affirmation, as we have said, is for one who believes but does not wish to swear. No words are prescribed for the affirmation of such a witness as Schnell. It was for the court to adopt appropriate words. Those used were adequate for an affirmation under pain and penalty of perjury.[5]

(B) Some argument seems to be made that the testimony of the witness von Richter, who like Schnell testified to the participation by appellant in the recording of *Vision of Invasion,* could not be relied upon in support of an overt act of treason because he was a member of the Nazi party and had been seen wearing a Nazi membership button during the war. This argument is without legal significance. Whether or not the witness should be believed

was for the jury. It is not clear appellant contends von Richter could not qualify as a witness; we refer to the matter only because counsel has done so though we are not certain his reference was intended to evoke a ruling.

(C) Appellant urges that the witness Haupt should not have been heard in support of proof of an overt act because he testified that his own participation in *Vision of Invasion* was under compulsion and fear of death. The suggested conclusion that this rendered incredible his testimony regarding the participation of the accused does not follow.[6] It is not claimed his testimony regarding her participation was elicited by fear or compulsion and no reason is advanced why it necessarily should have been disregarded by the jury.

We note at this point that no question was raised at the trial as to the competency of von Richter or Haupt. Furthermore, appellant admitted her participation in the recording of *Vision of Invasion.* Nevertheless our above rulings on competency and the admissibility of testimony are not based upon this admission. We do not discuss the question whether her admission dispensed with the need of other testimony as to the commission of overt act No. 10 (see Cramer v. United States, 325 U.S. 1, dissenting opinion at page 63, 65 S.Ct. 918, 89 L.Ed. 1441) because independently of her testimony the constitutional requirement of two witnesses to the same overt act was met.

### III

### The Question Whether the Indictment Stated an Offense

The theory of this contention is that treason may not be committed by words, that all vocal utterances are, by reason of their nature and regardless of all else, an exercise of freedom of thought, which may not be prohibited by condemning the expression of thought by words. Ex-

---

5. See note 4 supra.

6. We discuss under Part VII the question whether his testimony as to compulsion and fear of death bears on appellant's situation in that regard.

pression of thought or opinion about the Government or criticism of it is not treason. The oppressive use of the power of government to destroy political enemies by accusing them of crime underlay the determination of the framers of our Constitution to limit treason to acts, and to such acts only as come within the definition which is embedded in the Constitution itself. In addition, the First Amendment bars enlarging treason to include the mere expression of views, opinion or criticism. There is more to the crime than this.

In Cramer v. United States, supra, 325 U.S. at page 29, 65 S.Ct. at page 932, the Supreme Court has said:

" * * * the crime of treason consists of two elements: adherence to the enemy; and rendering him aid and comfort. A citizen intellectually or emotionally may favor the enemy and harbor sympathies or convictions disloyal to this country's policy or interest, but so long as he commits no act of aid and comfort to the enemy, there is no treason. On the other hand, a citizen may take actions which do aid and comfort the enemy—making a speech critical of the government or opposing its measures, profiteering, striking in defense plants or essential work, and the hundred other things which impair our cohesion and diminish our strength—but if there is no adherence to the enemy in this, if there is no intent to betray, there is no treason."

There is no question in our mind that words may be an integral part of the commission of the crime if the elements which constitute treason are present; that is, if there is adherence to and the giving of aid and comfort to the enemy by an overt act proved by two witnesses, with intention to betray, though the overt act be committed through speech. A similar question has been similarly decided in Chandler v. United States, 1 Cir., 1948, 171 F.2d 921, certiorari denied, 1948, 336 U.S. 918, 69 S.Ct. 640, 93

L.Ed. 1081. See, also, United States v. Best, D.C.Mass.1948, 76 F.Supp. 857; Rex v. Joyce, 173 L.T.R. 377, Affirmed sub nom, Joyce v. Director of Public Prosecutions, (1946) A.C. 347; Charge to Grand Jury—Treason, C.C.S.D.Ohio 1861, 30 Fed.Cas. at pp. 1036, 1037, No. 18,272 [communication of intelligence to the enemy]; Charge to Grand Jury—Treason, C.C.S.D.N.Y.1861, 30 Fed.Cas. at pages 1034, 1035, No. 18,271 [advising, inciting or persuading others to give aid and comfort to the enemy]; and Cramer v. United States, supra, 325 U.S. at page 29, 65 S.Ct. 918. While the crime is not committed by mere expressions of opinion or criticism, words spoken as part of a program of propaganda warfare, in the course of employment by the enemy in its conduct of war against the United States, to which the accused owes allegiance, may be an integral part of the crime. There is evidence in this case of a course of conduct on behalf of the enemy in the prosecution of its war against the United States. The use of speech to this end, as the evidence permitted the jury to believe, made acts of words. The First Amendment does not protect one from accountability for words as such. It depends upon their use. It protects the free expression of thought and belief as a part of the liberty of the individual as a human personality. But words which reasonably viewed constitute acts in furtherance of a program of an enemy to which the speaker adheres and to which he gives aid with intent to betray his own country, are not rid of criminal character merely because they are words.

## IV

(A) Whether the Political Nature of Treason Entitled Appellant to Asylum in Germany, and (B) Whether the Court had Jurisdiction Over Appellant

These questions were not raised before the trial court. Because of the provisions of Rule 12(b) (2), Fed.R.Crim.P.,[7] it is

---

7. "(2) Defenses and Objections Which Must be Raised.—Defenses and objections based on defects in the institution of the prosecution or in the indictment or information other than that it fails to show jurisdiction in the court or to charge an offense may be raised only by motion before trial. The motion shall include all such defenses and objections then available to the defendant. Failure

therefore doubtful that we should consider them. But we do so and find no merit in them.

■ (A) The argument that appellant was entitled to asylum in Germany rests no doubt, though not explicitly so stated, upon the Extradition Treaty between the United States and Germany of July 12, 1930, 47 Stat. 1862, 1867. It provides in Article I for the surrender on requisition by either of the signatory powers of a person charged with or convicted of certain crimes, not including treason, committed within the territorial jurisdiction of one of the signatories and found within the territory of the other. As to the pertinence of this treaty to the contention made, we can do no better than adopt the disposition of a like question in Chandler v. United States, supra, 171 F.2d at page 935, where it is pointed out that the treaty applies only to fugitives who have fled the country where the crime was committed. The court (Magruder, Ch.J) also said:

"In the absence of treaty a State may, without violating any recognized international obligation, decline to surrender to a demanding State a fugitive offender against the laws of the latter. United States v. Rauscher, 1886, 119 U.S. 407, 411, 412, 7 S. Ct. 234, 30 L.Ed. 425. Particularly as regards fugitive political offenders—including, presumably, persons charged with treason. Ex parte Commonwealth of Kentucky v. Dennison, 1868, 24 How. 66, 16 L.Ed. 717 —it has long been the general practice of States to give asylum. But the right is that of the State voluntarily to offer asylum, not that of the fugitive to insist upon it. * * *." 171 F.2d at page 935.

■ (B) The court had jurisdiction to try appellant notwithstanding she was brought against her will into the District of Columbia from Germany. The court was not required to refuse to try her when she was in fact here, even assuming for present purposes that she was brought here unlawfully. Chandler v. United States, supra, and cases cited, 171 F.2d at page 934. See, also, Pettibone v. Nichols, 1906, 203 U.S. 192, 27 S.Ct. 111, 51 L.Ed. 148, 7 Ann.Cas. 1047; In re Johnson, 1896, 167 U.S. 120, 17 S.Ct. 735, 42 L.Ed. 103; Cook v. Hart, 1892, 146 U.S. 183, 13 S.Ct. 40, 36 L.Ed. 934; Mahon v. Justice, 1887, 127 U.S. 700, 8 S.Ct. 1204, 32 L.Ed. 283; Ker v. Illinois, 1886, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421.

The Act of June 18, 1878, 20 Stat. 152, 10 U.S.C. § 15 (1946) 10 U.S.C.A. § 15, is invoked. It reads:

"* * * It shall not be lawful to employ any part of the Army of the United States, as a posse comitatus, or otherwise, for the purpose of executing the laws, except in such cases and under such circumstances as such employment of said force may be expressly authorized by the Constitution or by act of Congress; * * * and any person willfully violating the provisions of this section shall be deemed guilty of a misdemeanor and on conviction thereof shall be punished by fine not exceeding $10,000 or imprisonment not exceeding two years or by both such fine and imprisonment."

As the Chandler case points out, the immediate purpose of the above provision was "to put an end to the use of federal troops to police state elections in the ex-Confederate states where the civil power had been reestablished." Chandler v. United States, supra, 171 F.2d at page 936. By using the words "posse comitatus" the Congress intended to preclude the Army from assisting local law enforcement officers in carrying out their duties. The use of our Army of Occupation in Germany could not be characterized as a "posse comitatus" since it was the law enforcement agency in Germany at the time of appellant's arrest. "The right of one belligerent to occupy and govern the territory of the enemy while in its military possession is one of the incidents of war, and flows directly from the right to conquer. We, therefore, do not look to the Con-

---

to present any such defense or objection as herein provided constitutes a waiver thereof, but the court for cause shown may grant relief from the waiver. Lack of jurisdiction or the failure of the in-

dictment or information to charge an offense shall be noticed by the court at any time during the pendency of the proceeding."

stitution, or political institutions of the conqueror, for authority to establish a government for the territory of the enemy in his possession, during its military occupation, nor for the rules by which the powers of such government are regulated and limited." Dooley v. United States, 1900, 182 U.S. 222, 230, 21 S.Ct. 762, 765, 45 L.Ed. 1074, quoting Halleck on International Law, Vol. II, page 444. See, also, MacLeod v. United States, 1912, 229 U.S. 416, 425, 33 S.Ct. 955, 57 L.Ed. 1260.

The right to arrest being a part of the right to govern, it cannot be doubted that our Army of Occupation was authorized to arrest notwithstanding 10 U.S.C.A. § 15. Since we think it inapplicable in this case, it is unnecessary to determine whether the statute is extraterritorial in its scope. See Chandler v. United States, supra, 171 F.2d at page 936. It is also unnecessary to consider what effect a violation of the statute would have on appellant. The statute speaks only of the person who has violated its command and not of the person arrested thereby. There is no contention made that fruits of an alleged illegal arrest were used in obtaining appellant's conviction. Cf. McNabb v. United States, 1942, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819.

## V

### The Question of Self-Incrimination

■ The Government introduced in evidence recordings of her voice and of statements made by the appellant. This was accomplished at the trial with the aid of a mechanical device installed in the court room. It is said that the use as evidence of these recordings deprived appellant of the protection of the Fifth Amendment that no person "shall be compelled in any criminal case to be a witness against himself * * *." There was no compulsion upon the accused in the introduction of this evidence. It was not given in court by her at all. It consisted of reproductions of state-

ments previously made by her. She had no part in their use at the trial except that they were a record of what she had said and done. The situation is analogous to that of an accused who had written a letter material to an issue on his trial. He could not object on constitutional grounds to its use in evidence merely because he was its author. The recordings here involved had been made to be heard over the air by uncounted numbers of persons. The constitutional provision relied upon does not prohibit the jury from hearing them if their contents are relevant and material to the case.

## VI

### The Question Whether Records Introduced in Evidence Were Obtained in Violation of Appellant's Constitutional Right and Therefore Should Have Been Excluded

■ Even if the full sweep of the constitutional protection [8] against unreasonable searches and seizures were available to appellant in Germany,[9] her rights thereunder have not been violated. The circumstances surrounding the obtaining of the recordings were as follows: A special agent of the United States Counter Intelligence Corps was trying to locate appellant in Germany. He went to her former apartment in Berlin seeking information. Obtaining none he questioned other tenants of the building who indicated that certain property of appellant was stored in another building nearby. The agent went to the superintendent of that building, was taken to a room in the basement thereof, the door was opened for him, and he picked up certain manuscripts and recordings which were there. From all that appears the obtaining of the records was consented to by the one who had custody of them. No objection was made and no force appears to have been used. We cannot ourselves supply all that would be necessary to raise a serious question under

8. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S.Const. Amend. IV.

9. Cf. United States v. Best, D.C.1948, 76 F.Supp. 857.

the Fourth Amendment. See United States v. Best, supra, involving a seizure in Austria by a member of the United States Armed Forces in 1946. Appellant herself testified that she did not know if these records were her own property. Furthermore, it is difficult to perceive any prejudice in their admission since there was in evidence recordings of the identical program obtained through independent sources in a manner not subject to appellant's objection. Government exhibits 25–A, 25–B, 25–C, 25–D, 25–E and 25–F, which are the seized records, contain the same program that is recorded in Government exhibit 5. The latter was recorded by the Federal Communications Commission at Silver Hill, Maryland, and of course is not subject to objection by appellant under the Fourth Amendment.

10. "The Court. If he can testify as to what conditions this defendant worked under—

"Mr. Laughlin (interposing): He can do that.

"The Court. That is one thing.

"Mr. Laughlin. He can do that.

"The Court. But any conversation he had with Cleinow about his own employment, I cannot admit that.

"Mr. Owen. If A and B are employed by employer C under what we might term reasonably the same conditions, the terms which the employer C might direct towards A should be admissible and received by the Court as indicative that they were the same for both.

"The Court. I cannot go that far.

"Mr. Owen. We think these authorities say that.

"The Court. I cannot go that far. I will admit any evidence that this witness may have within his own knowledge as to the conditions under which Miss Gillars was working at the time at the broadcasting company.

"Mr. Owen. Do you rule that a threat to this employee is immaterial to the issues in this case?

"The Court. That is correct.

\* \* \* \* \* \*

"By Mr. Laughlin: Q. Mr. Bechmann, as I ask you the question, listen and follow the question very carefully before you reply. As to the broadcasting, sir, were there specific and general instructions given by Cleinow as to the broadcasting that affected every person employed? A. Yes.

# VII

## The Question Whether Appellant Acted Under Threat, Compulsion and in Fear of Her Life

Appellant contends that she was erroneously precluded from proving that she was under threat, compulsion and in fear of her life in participating in the recordings. This argument rests upon the exclusion of certain testimony of witnesses Beckmann and Schafer regarding the fear under which they performed similar work. The court ruled that testimony of threats to persons other than the accused was immaterial and irrelevant but that testimony of conditions under which appellant herself worked would not be excluded. We set forth in the margin [10] a somewhat full excerpt from the

"Q. Now, then, were those instructions of Cleinow relayed to this defendant?

"Mr. Kelley. If he knows.

"A. Yes, sir, of course.

"By Mr. Laughlin: O. Now, then, tell us what those instructions were, that is, what the instructions were of Cleinow as to broadcasting that affected every employee? Now, first, I will ask you this: Did it affect every employee without exception? A. Every employee.

"Q. Now, tell us what those instructions were? A. That you would have to conform with the policies; that you would not dare, that you should not dare to waiver, or in any way construe those policies. One false turn and you would be put away—*that is what he told me.*

"The Court. Wait a minute; that is excluded.

"Mr. Kelley. I object.

"The Court. That is excluded.

"By the Court: Q. The question before you is whether or not Cleinow issued general instructions and to what members of the staff. A. Yes, sir.

"Q. And whether or not Miss Gillars received those instructions. A. That is right, yes, he did issue instructions.

"Q. And did Miss Gillars receive them? A. Yes.

"By Mr. Laughlin: Q. Now, were those instructions ——

"The Court (Interposing.): Just a minute, Mr. Laughlin, I haven't finished.

"By the Court: Q. Were those written instructions? A. Those instructions were forwarded.

record on this point. The witness Beckmann was employed in the German Overseas Service as a news editor and was engaged in broadcasting. He testified that Horst Cleinow was the managing editor of the German Overseas Service. From the testimony which we have set forth it seems clear that this witness could not say that the appellant herself was threatened. In the one instance in the record where he testified that the appellant told him she was threatened, by Cleinow, the evidence was not excluded.[11]

"Q. Written? A. Through the chief.
"Q. Were they written instructions? A. Well, I saw them.
"Q. Where? On a piece of paper? A. Yes, sir.
"Q. And that paper said that the employees could not have anything to do with the matter of policy? A. Your Honor, it pertained to me, but it was ——
"Q. (Interposing.) Just to you? A. Yes, but it was a general policy.
"Q. Now, then, these instructions that you received ——— A. (Interposing.) Yes.
"Q. Do you know whether Miss Gillars received them or not? A. That I can't say.
"Q. You don't know? A. No.
"The Court: Very well.
"The Witness. But it was to every employee.
"By Mr. Laughlin: Q. Now, in connection with that, sir, were you ever threatened? A. Yes, sir.
"Q. By whom?
"Mr. Kelley. Just a minute. I object.
"A. By Mr. Cleinow.
"The Court. I still sustain the objection.
"Mr. Kelley. I ask, again, if the Court please, to instruct the jury to disregard it.
"The Court. The jury will disregard the last answer."
[Italics supplied.]

11. "The Witness. * * * I asked her whether the defendant was an American citizen, and she said, 'I think so.' And I said to her, 'Don't you see how the war is going, aren't you trying to get out of this?'

"She says, 'Well, I tried to get out of it but Cleinow threatened me.' That was the text of the conversation I had with her, and it impressed me and I remember it only because Cleinow had threatened me personally, previously."

As to Schafer, he testified that he engaged in all-around radio work during the period he knew the appellant in Berlin; that he was working at the recording studio at Koenigswusterhausen where the so-called overseas broadcast from Germany was made, and that he was familiar with the set-up, which he proceeded to explain. We set forth in the margin his further testimony relevant to the present question.[12] Here, too, it will be seen that the court ruled correctly. We are unable to find any competent evidence which was excluded to the

2. "By Mr. Laughlin:
* * * * * *
"Q. Now, then, were you ever threatened in connection with your work?
"Mr. Kelley. I object.
"The Court. I sustain the objection.
"By Mr. Laughlin: Q. Do you know of any threats made against this defendant? A. What the defendant told me herself; yes.
"Q. And when was that. A. That was in Koenigswusterhausen.
"Q. And what did she say to you?
"Mr. Kelley. Just a minute. I object to that; hearsay.
"The Court. Sustained. What the defendant told him is a self-serving declaration.
"Mr. Laughlin. Well, of course, if this defendant is threatened—of course, the man who threatened her we thought the Government would produce. They have used that witness in other trials, but for reasons possibly convenient for them, they didn't produce him here.
"The Court. Well, I don't know anything about that, Mr. Laughlin. I am bound by the rules; that is all. It seems clear to me that is not admissible.
"Mr. Laughlin. I wonder if Mr. Kelley would tell us if Mr. Cleinow is now available.
"Mr. Kelley. I understand he is in New York, sir.
"Mr. Laughlin. All right. Would you object to his appearance in the same manner you objected to other witnesses?
"Mr. Kelley. I will produce him for you.
"Mr. Laughlin. We will discuss that at the end of the day, and you will produce other witnesses we have discussed?
"The Court. If there is any discussion, it will be at the bench and not in the presence of the jury.

effect that appellant worked under threat or compulsion, including any threat of being sent to a concentration camp. The witnesses did not testify that appellant was threatened or was under compulsion or acted in fear of her life, and appellant herself did not so testify. She did say that active opposition would have meant death.[13] But she was not charged with having refused to engage in active opposition.

The exclusion by the court of evidence of the distinction between an internment camp and a concentration camp was not erroneous since no one, not even appellant, testified that she acted in any manner under fear of either type of camp or under any threat of being sent to either.

## VIII

### Questions Raised as to the Instructions to the Jury

It is said that the court erred in instructing the jury as a matter of law that fear of a concentration camp could not excuse an act of treason. The charge given by the court, which is set forth in the margin to the extent required to clarify the present contention,[14] fairly and fully states the law in regard to such coercion or compulsion as would constitute a defense insofar as the evidence called for instructions on this matter. The appellant particularly questions the correctness of the following portion of the charge:

"Nor is it sufficient that the defendant thought she might be sent to a concentration camp, if you so find, nor are threats to other persons sufficient."

The Government contends that this statement is correct, citing Respublica v. McCarty, 1781, 2 Dall 86, 2 U.S. 86, 1 L.Ed. 300. The court there charged the jury that the fear which would excuse defendant's alleged treason must be that of "immediate death, not the fear of any inferior personal injury" and also that the fear must continue through the time of the acts. In United States v. Vigol, 1795, 2 Dall 346, 2 U.S. 346, 1 L.Ed. 409, also cited by the Government, the alleged treason was in

---

13. "Q. Did you sympathize with the Nazi cause and ideology? A. No, Mr. Kelley, I did not.

"Q. Did you oppose it?

"Mr. Laughlin. I object to that, Your Honor.

"The Court. Overruled.

"By Mr. Kelley: Q. Did you hear the question? A. Yes. You asked me if I opposed it. I don't know how to answer that question because an active opposition would have been death."

14. "Since every crime requires a voluntary mind it may be a defense to a criminal charge that the criminal act was not committed voluntarily but was the result of coercion, compulsion or necessity. * *

"The term necessity has various meanings in the law, but in the sense of a defense of crime, it has a general meaning of some unavoidable circumstance, condition or fact, which leaves no choice of action.

"* * * In order to excuse a criminal act on the ground of coercion, compulsion, or necessity, one must have acted under the apprehension of immediate and impending death or of serious and immediate bodily harm.

"*　*　*　*　*　*

"Moreover, the force and fear, in order to constitute a defense in a case of treason, must continue during all the time of such service with the enemy, and one who makes force his defense must show that he left the service as soon as he could. In other words, ladies and gentlemen of the jury, this coercion or compulsion that will excuse a criminal act must be present, immediate and impending, and of such a nature as to induce a well grounded apprehension of death or serious bodily injury if the act is not done.

"* * * Nor is it sufficient that the defendant thought she might be sent to a concentration camp, if you so find, nor are threats to other persons sufficient. * * *

"If you believe from the evidence that the defendant committed these acts that the Government alleges to be of a treasonable character under a well grounded apprehension of immediate death or serious bodily injury to be inflicted by Dr. Koischwitz or any agent of the German Reich, and those facts are substantiated by the evidence in this case, you would be warranted in finding that the defendant committed the alleged acts under coercion and compulsion, and under those circumstances it would be your duty under the law to return a verdict of not guilty."

taking part in the Whiskey Rebellion. During his charge to the jury, the judge stated in part:

"* * * the fear, which the law recognises as an excuse for the perpetration of an offence, must proceed from an immediate and actual danger threatening the very life of the party. The apprehension of any loss of property, by waste or fire; or even an apprehension of a slight or remote injury to the person, furnish no excuse. * * *" 2 Dall at page 347, 2 U.S. at page 347, 1 L. Ed. 409.

In any event there was no harm or prejudice to appellant in regard to this matter. This is so because the evidence does not show that she was ever threatened with being sent to a concentration camp. There was no call upon the court to go into the nature of these places or to instruct with respect to the effect of fear of them unless they were brought home to the accused as a threat. This was not done. The instructions which were granted were indeed all that the evidence warranted.

Other portions of the charge are called to our attention in appellant's brief but no specific argument is advanced regarding them. We have examined the charge as a whole and find no material or prejudicial error.

## IX

## The Exclusion of Evidence of the Results of Appellant's Broadcasts

 The contention is that the court erred in refusing to permit evidence to be introduced as to the effect of appellant's broadcasts. Appellant testified that she made the records in order to aid the United States and without treasonable intention. She claims that evidence of the effect of her records or broadcasts bore on this question of intent. The Government cites Chandler v. United States, supra, 171 F.2d page 941, to support the position that the effect of an accomplished overt act is immaterial. Appellant argues the effect bears on intent and we do not read the Chandler case as deciding to the contrary. But there was no offered evidence as to the effects of the broadcasts which was excluded; particularly, there was no offer regarding the effect of the broadcast of *Vision of Invasion*. The question therefore is entirely an abstract one without impact upon the case. At one point counsel for appellant undertook at the court's suggestion to file a statement in writing as a basis for the obtaining of witnesses in this regard, but failed to do so.[15] We do not imply that evidence of the character suggested should have been admitted if offered. We would want to examine the question of its relevance, including consideration of the degree of remoteness in the light of the actual offer.

## X

## The Question of a Public Trial

 It is claimed that substantial portions of the evidence were introduced by way of electrical transcriptions heard by the jury through private earphones with the public being deprived of hearing a large part of the testimony. Twenty-three sets of earphones for the press and six for the use of spectators were provided in addition to sets for the court officials, the jury and counsel. The following provision of the Sixth Amendment is invoked:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial * * *."

To meet the problem created by the introduction in evidence of recordings, earphones were used as a matter of conven-

15. "Mr. Laughlin. Your Honor, in view of the testimony of the witness, we now ask that we be permitted to summon the soldiers that come into this now, and who will testify and contradict this witness [who had testified as to the adverse effect of defendant's broadcasts on the morale of the United States Army].

"Mr. Kelley. I object to this speech. A matter of this kind should be determined up at the bench. It is prejudicial and you know it.

"The Court. There is only one way in which the Court can pass upon your request. You will have to make a proper foundation in an affidavit.

"Mr. Laughlin. We will put it in written form, Your Honor.

"Mr. Kelley. All right."

ience and expediency. This did not deprive appellant of a public trial. While earphones were not provided for all, there was no exclusion of spectators as such or exclusion of earphones for members of the public or of the press. We find no decided case similar in facts; but the point raised must be resolved by a common-sense view of the situation. There was no secrecy. There was no exclusion from public knowledge of all that transpired. The fact that all of the public were not immediately within the hearing of this testimony did not transform the trial into a nonpublic one. The use of earphones at Nuremberg and at the sessions of the United Nations have not rendered those proceedings nonpublic, though no constitutional question is involved in those instances of their use.

## XI

### The Question of Compulsory Process

 Appellant requested the court to subpoena certain witnesses residing in Germany who were not citizens of the United States. The Court refused because of lack of authority to grant the request. Appellant contends that this infringed the constitutional provision that:

"In all criminal prosecutions, the accused shall enjoy the right * * * to have compulsory process for obtaining Witnesses in his favor * * *". U.S.Const.Amend. VI.

Rule 17(e) (2) of the Rules of Criminal Procedure provides:

"A subpoena directed to a witness in a foreign country shall issue under the circumstances and in the manner and be served as provided in Title 28 U.S.C., § 1783."

Said 28 U.S.C.A. § 1783, provides:

"(a) A court of the United States may subpoena for appearance before it, a citizen or resident of the United States who: * * *"

Assuming that Rule 17(b), Fed.R.Crim. P., grants an indigent defendant, as was appellant, the right to have a subpoena issue for a witness to appear from outside the United States, § 1783 would appear to preclude such a subpoena of an alien.

In United States v. Best, D.C.Mass.1948, 76 F.Supp. 138, 139, a similar request was denied on the ground,

"Aliens who are inhabitants of a foreign country cannot be compelled to respond to a subpoena. They owe no allegiance to the United States. Cf. Blackmer v. United States, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375."

The cited Blackmer case upheld a contempt conviction for failure of a citizen while abroad to respond to a subpoena issued pursuant to the aforementioned U. S. Code provision. The Court clearly considered the provision valid because it applied only to citizens.

The serious constitutional difficulty which might arise by reason of the absence of compulsory process to aid an accused who has been involuntarily transported to the United States for trial, far removed from the vicinity of the acts charged, is not presented for decision. The five witnesses for whom subpoenas were asked were all brought to this country by the Government. Four, Christiani, Schmidt-Hanson, Beckmann and Schafer, testified; and the fifth, Kloss, was with appellant's acquiescence returned to Germany because of illness. The constitutional right to compulsory process was not violated to the injury of appellant when the lack of such process was accompanied by the actual availability and presence of the witnesses for whom the process was desired. It is of no aid to an accused to assert that a fair trial requires the reasonable availability of witnesses on one's behalf when the witnesses are in fact available.

## XII

### The Question Whether Treason May be Committed by a Citizen of the United States While Residing in the Territory of an Enemy

 Appellant urges that the crime of treason under the law of the United States does not have extra-territorial scope. It is said that this follows from the general presumption against giving extra-territorial application to criminal statutes, and also because, it is said, treason is not committed by a citizen who resides in enemy country

and therefore must engage in some trafficking with the enemy. As to the first branch of the argument, the Supreme Court has decided that the Constitution does not forbid the application of the criminal laws of the United States to acts committed by its citizens abroad. It is a question in each case of the intent of the lawmakers.

"While the legislation of the Congress, unless the contrary intent appears, is construed to apply only within the territorial jurisdiction of the United States, the question of its application, so far as citizens of the United States in foreign countries are concerned, is one of construction, not of legislative power." Blackmer v. United States, 1931, 284 U.S. 421, 437, 52 S.Ct. 252, 254, 76 L.Ed. 375.

See, also, United States v. Bowman, 1922, 260 U.S. 94, 102, 43 S.Ct. 39, 67 L.Ed. 149; American Banana Co. v. United Fruit Co., 1908, 213 U.S. 347, 357, 29 S.Ct. 511, 53 L.Ed. 826, 16 Ann.Cas. 1047; Skiriotes v. Florida, 1940, 313 U.S. 69, 73, 61 S.Ct. 924, 85 L.Ed. 1193.

The treason statute, enacted by the first Congress in 1790, supra, condemns the giving to the enemy of "aid and comfort within the United States or elsewhere". This rebuts any presumption against extra-territorial application of our treason law which might have existed under the general rule. By the statute itself the overt act may be committed outside the United States. Adherence to the enemy and the treasonable intent, when they exist, attach to the act and to its perpetrator wherever he is. These factors too, therefore, may be outside the United States, and so, accordingly, may the whole of the crime. Aside from the intention of Congress expressed in the statute we are of the opinion that the usual presumption against extra-territorial application of the criminal law does not apply to treason. The purpose of a criminal statute ordinarily is to protect the domestic order, not to reach across national boundaries to take hold of persons within the jurisdiction of another nation. But treason is directed against the existence of the nation and by its nature consists of conduct which might ordinarily be exerted from without in aid of the enemy which is, usually, without. The

act of adhering to the enemy, giving it aid and comfort, not unnaturally attaches to the enemy wherever it is. While the Constitution is silent on the question the statutory definition which quickly followed the Constitution was the handiwork of many of those who framed the greater instrument. The use in the statute therefore of the words, "within the United States or elsewhere," is strongly indicative of the territorial range of the constitutional provision. While treason shall consist only of that which is made so by the Constitution; while its nature is limited, Cramer v. United States, supra, the reasons which led the founders to circumscribe the conduct which would constitute the crime do not restrict its territorial reach. See discussions in the recent Chandler case, in both the District Court [D.Mass.1947, 72 F.Supp. 230] and in the Circuit Court of Appeals [supra]. See, also, the reasoning of the Court in United States v. Bowman, supra, and United States v. Stephan, D.C.E.D.Mich.1943, 50 F.Supp. 738, 741; 6 Cir., 1943, 133 F.2d 87, 99, certiorari denied 1943, 318 U.S. 781, 63 S.Ct. 858, 87 L.Ed. 1148.

As a second branch of the present argument appellant states that a citizen of the United States residing in enemy country is under the obligation of local allegiance and one so situated is not guilty of treason by reason of some trafficking with the enemy. Therefore, it is said, doubt should be resolved against extra-territorial application. A kindred point grows out of appellant's objection to the court's instruction to the jury:

"* * * she has stipulated that she was and is now an American citizen. During the period set forth in the indictment the defendant, being a citizen of the United States, owed allegiance to her native country and no obligation of local allegiance required or compelled the defendant to assist Germany in the conduct of its war against the United States."

As the court instructed, obedience to the law of the country of domicile or residence —local allegiance—is permissible but this kind of allegiance does not call for adherence to the enemy and the giving of aid and

comfort to it with disloyal intent. See The Venus, 1814, 8 Cranch 253, 12 U.S. 253, 3 L.Ed. 553. It would not be reasonable to say that treason can be committed only within the territory of the United States because the framers of the Constitution and the members of the First Congress must have known that some local allegiance was required of American citizens living in enemy territory. It is not disputed in this case that a citizen in enemy country owes temporary allegiance to the alien government, must obey its laws and may not plot or act against it. The Court properly instructed on this subject. But in a trial for treason involving the question of failure to live up to the obligation of allegiance attaching to citizenship the question is for the jury to determine on the evidence whether what was done fell within permissible obedience to a foreign power or within the area of treason. As we have seen under Part I, supra, there was adequate evidence to go to the jury on the questions involved. The instructions to the jury required the finding of all elements which constitute the crime. The statement that local allegiance did not require or compel appellant "to assist Germany in the conduct of its war against the United States" must be read with the instruction as a whole delineating the factors essential to be believed beyond a reasonable doubt as a requisite to conviction. The court adequately covered the particular point by instructing the jury, in addition to the instruction complained of by appellant, as follows:

"This defendant, while residing in the German Reich, owed qualified allegiance to it. She was obliged to obey its laws, and she was equally amenable to punishment with citizens of that country if she did not do so. At the same time, the defendant, while residing in Germany during the period stated in the indictment, owed to her Government, that is, the United States Government, full, complete and true allegiance."

## XIII

### The Substitution of an Alternate Juror

It appears that when the jury was being selected the panel was asked under oath on *voir dire* whether "any of you are opposed to the death penalty" and one of the panel failed to respond and was accepted on the jury. After the jury was sworn but before opening arguments or the taking of any testimony the court recessed. On the following day before court opened this juror advised the Clerk that she did not think she was qualified to serve as a juror because she was opposed to the death penalty. Upon the convening of court the jury was excused and the lady, upon inquiry by the trial judge, said that she realized she had made a mistake in not disclosing her attitude when questioned on *voir dire* but that she had never served on a jury before and did not think seriously about the question when it was asked. She further said that in fact she was opposed to the death penalty and did not believe she could render a fair and impartial verdict in the case. She was thereupon excused by the trial judge and Alternate Juror No. 1 was substituted in her place. The applicable Rule, 24 (c) Fed.R.Crim.P., reads in part as follows:

"(c) *Alternate Jurors.* The court may direct that not more than 4 jurors in addition to the regular jury be called and impanelled to sit as alternate jurors. Alternate jurors in the order in which they are called shall replace jurors who prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties. * * *"

Appellant contends that the juror's opposition to capital punishment is not such disqualification as is contemplated by the Rule. In our view the disclosure by the juror of her position as above stated was the disclosure of a disqualification for which she should have been excused as was done. See, Logan v. United States, 1891, 144 U.S. 263, 298, 12 S.Ct. 617, 36 L.Ed. 429; Funk v. United States, 1900, 16 App.D.C. 478, 487; Snell v. United States, 1900, 16 App.D.C. 501, 507. This being so it was quite proper for the judge to substitute an alternate juror as provided in the Rule. No reason to the contrary has been suggested by appellant except that the jury had been sworn. But no proceedings had been taken except the selec-

tion of the jury and the substitution was timely. See Sullivan v. State, 1929, 155 Miss. 629, 125 So. 115; Manning v. State, 1927, 155 Tenn. 266, 292 S.W. 451.

## XIV

The Question Whether Appellant Owed Allegiance to the United States and Whether This Question Should Have Been Submitted to the Jury

■ An essential element of the crime of treason is that the one accused must be shown to owe allegiance to the United States. This ingredient of the offense was rested in this case upon citizenship. If appellant was a citizen at the time of the alleged crime the obligation of allegiance was sufficiently proved because such obligation inheres in citizenship. Carlisle v. United States, 1872, 16 Wall 147, 154, 83 U.S. 147, 154, 21 L.Ed. 426; Cramer v. United States, supra. There is no question that appellant had been a native born citizen. There is no question either that she retained this citizenship intact until Japan attacked the United States at Pearl Harbor December 7, 1941, at which time appellant was in the employ of a German Government agency engaged in radio broadcasting. There is no question, further, that on the trial on numerous occasions appellant asserted that she claimed American citizenship. Indeed, a stipulation was entered into on the trial and read to the court with the approval of her counsel that she "is now and always has been a citizen of the United States of America." In the affidavits filed in this court in connection with the appellate proceedings she has stated that she has always maintained that she is a citizen of the United States although, as she stated in one affidavit, "her passport was taken from her while she was in Germany."

■ Notwithstanding the foregoing, two arguments are advanced to support the contention that appellant did not owe allegiance to the United States. One is that her American passport had been unqualifiedly revoked by an authorized consular agent of the United States. The evidence does not indicate revocation but that in 1941 she presented her passport to the consular agent in Germany for renewal and it was retained. She was given a receipt for the passport and never returned to the office. In any event, the revocation of a passport, nothing more appearing, does not cause a loss of citizenship or dissolve the obligation of allegiance arising from citizenship. A passport is some, though not conclusive, evidence of citizenship. It is a valuable and useful documentation, particularly as an aid to travel and as identification in foreign lands; but the absence or revocation of a passport does not deprive an American of citizenship. A large discretion in the issuance of passports is lodged by Congress in the Secretary of State. Perkins v. Elg, 1938, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320; Miller, Alien Property Custodian, et al. v. Sinjen, 8 Cir., 1923, 289 F. 388. See, also, Digest of International Law, Hackworth, Vol. III, p. 470.

In Rex v. Joyce, supra, affirmed sub nom. Joyce v. Director of Public Prosecutions, supra, it was held under the facts of that case, including Joyce's application for and obtaining of a British passport, that he owed allegiance to the British Crown though he was not a British subject. We need not pass upon the correctness of that decision. It clearly does not support the proposition that a citizen who is denied a passport or who is without one or whose passport is withdrawn thereby loses the rights of citizenship or is relieved of its obligations. The full significance of such withdrawal or revocation might be no more than a decision not to facilitate the travel or other activities of the citizen affected.

■ The other contention regarding allegiance is that subsequent to the attack by Japan on the United States at Pearl Harbor December 7, 1941 and prior to our declaration of war with Germany December 11, 1941, appellant signed some paper in the nature of an oath or affirmation of allegiance to Germany, and that this brought about a dissolution of her citizenship and allegiance to the United States. More precisely, the argument is that the question of expatriation thus raised should

have been submitted to the jury upon the basis of the following requested instruction, which was rejected:

"You are instructed that if you believe from the evidence that the defendant took an oath or affirmation or other formal declaration of allegiance to Germany before any overt act or acts named in the indictment were alleged to have been committed, you must acquit the defendant. U.S.C., Title 8, Sec. 801B (1946 Ed.)"

Counsel for the appellant argued to the jury that they should keep in mind whether she had signed such an oath and that if it conformed to the statute she expatriated herself and should be acquitted on that account if for no other reason. Thereafter the trial judge instructed the jury as follows:

"* * * our law declares the right of expatriation to be 'A natural and inherent right of our people, indispensable to the enjoyment of the rights of life, liberty and the pursuit of happiness.' Expatriation is the voluntary renunciation of one's citizenship, a voluntary act done with intent to renounce or forswear allegiance to the country of one's birth. In order then to be relieved of the duty of allegiance imposed by American citizenship, one must do some voluntary act of renunciation or abandonment of American nationality and allegiance, according to law.

"Section 401 of the Nationality Act of 1940, which is Title 8 of the United States Code, Section 801 in effect since January 13, 1941, provides, among other things, that a person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by taking an oath or affirmation or other formal declaration of allegiance to a foreign state.

"This connotes something done in due form or with solemnity.

"During the trial the defendant testified that Dr. Karlson sat down at his typewriter and wrote in German something which she submitted the next day to Mr. Schmidt-Hanson. She said that translated it 'would be something to the effect that: I swear allegiance to Germany and signed Mildred Gillars.'

\* \* \* \* \* \*

"You are instructed that so vague and indefinite a statement as 'translated would be something to the effect that: I swear allegiance to Germany and signed Mildred Gillars,' which statement was handed by one person to another, is not an oath, affirmation or other formal declaration of allegiance to a foreign state within the meaning of Section 401 of the Nationality Act of 1940."

The terms of the statute referred to are as follows:

"A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by: * * * (b) taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state;" 8 U.S.C. § 801 (1946) 8 U.S.C.A. § 801.

The testimony is vague as to the exact contents of the paper. It was not available at the trial. Appellant said that following the attack by Japan at Pearl Harbor she was told by Mr. Christiani, one of the monitors who checked on the live broadcasts, that she should go to the office of Mr. Schmidt-Hanson the following day before continuing work; that she did so and was told that he had heard about her remarks the preceding day, December 7, critical of the Japanese, that he hoped she understood the seriousness of the situation and that she could not resume work before she had submitted a written oath of allegiance to Germany; that she left, went to the home of a friend, Dr. Karlson, to discuss the matter with him and he "sat down at a typewriter and wrote in German what I submitted then the next day to Mr. Schmidt-Hanson". She described it as follows: "it was in German and translated would be something to the effect that: I swear my allegiance to Germany and signed Mildred Gillars." She said she did this because "it is obvious one has to live somehow". She took the paper to Mr. Schmidt-Hanson on the 9th, to the best of her recollection.

Assuming the truth of this testimony the question is whether it raised an

issue for resolution by the jury or whether the court properly ruled that the testimony was insufficient to furnish the basis for a finding of expatriation. It should be noted that the testimony was not introduced for the purpose of showing expatriation but in explanation of the situation in which appellant found herself and as bearing on her reasons for doing the work in which she was engaged. This is indicated not only by the testimony itself but by her position throughout the trial, except at the end, that she was a citizen. Nevertheless, if what she did cut the bonds of citizenship or raised a question to be decided by the jury her inconsistent claims of citizenship did not preclude her from defending on the basis of its loss if such basis existed. There is no indication, however, that the paper which she said she signed was intended as a renunciation of citizenship; there is no testimony whatever that it was sworn to before anyone authorized to administer an oath or indeed before anyone at all; its exact content is uncertain; if it be treated as an affirmation or declaration rather than an oath it is informal rather than formal in character; and there is no connection whatever shown between it and any regulation or procedure having to do with citizenship or attaching oneself to the Reich or to Hitler. These circumstances preclude attributing to it the character of such an oath or affirmation or other formal declaration as the statute requires to bring about expatriation. We think the court was correct in not permitting the jury to speculate as to the effect of this testimony on citizenship and in ruling that as a matter of law the appellant at the times involved was a citizen of the United States and owed allegiance to her native land. This view is consistent with the discussion of the question in Hackworth, Digest of International Law, 1942, Vol. III, p. 217 et seq.; and is in line with the meaning given to the statute by the Board of Immigration Appeals In the Matter of L..., 1 I. and N. Dec. 317 (1942) where it said:

"An oath of allegiance has no real significance unless the oath be made to the state and accepted by the State. Such acceptance on the part of the State must be made in accordance with the laws of that State." (1 I. and N. Dec. at 320.)

In the case referred to the oath in terms was to the King but was given in connection with employment by an airline company controlled by the Canadian Government. Expatriation was held not to result. Further, in the case at bar the record does not show any requirement of the "oath" on the part of the German Government. Rather the incident appears to have been a disciplinary move of a minor company official.

Appellant refers to the statement of Secretary of State Hughes that "Congress did not have in mind any particular formula" in making the oath of allegiance a vehicle of expatriation. The Secretary said:

"It is the spirit and meaning of the oath, and not merely the letter, which is to determine whether it results in expatriation. It is not a mere matter of words. The test seems to be the question whether the oath taken places the person taking it in complete subjection to the state to which it is taken, at least for the period of the contract, so that it is impossible for him to perform the obligations of citizenship to this country." Quoted in Hackworth, Digest of International Law, Vol. III, p. 219.

But the oath in question in that letter, which is set forth in the margin [16] is a much more complete and formal instrument than the one asserted to have been made in the case at bar. In addition it was made to the foreign state and not to a government corporation. A comparison of the Act of March 2, 1907, 34 Stat. 1228, which was superseded by the statutory provision here in question, i. e. 8 U.S.C. § 801 (1946), 8 U.S.C.A. § 801(b), evidences no relaxation of formality under the present law. Thus the law was changed from "an oath of allegiance to any foreign state"

16. "I [name of person] swear by the Almighty and all-knowing God to faithfully serve his Majesty, the King Frederick August of Saxony, during my term of military service, also to obey his majesty the emperor and the laws of war and to always conduct myself as a brave and honorable soldier, so help me God."

984

to "taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state". Construing the prior law the office of the Solicitor of the Department of State said:

"* * * Congress had in mind any solemn, formal and binding obligation to serve a foreign state voluntarily entered into by a citizen of the United States. * * *" Quoted in Hackworth, Digest of International Law, Vol. III, p. 221.

The informality and vagueness of the transaction here in question does not satisfy the statute in our opinion.

Appellant states, in addition, that the instruction of the jury on citizenship took her counsel by surprise, placed him in a false position before the jury, and constituted material error. This argument is based on the fact that counsel for appellant understood as the result of a conference at the bench that he was permitted to argue to the jury on the subject of the oath of allegiance to Germany rendering appellant innocent of treason. He did so argue to the jury. He says that for the judge thereafter to instruct the jury that there was no question for them to decide in this matter placed him in such a light before the jury as to constitute prejudicial error. We find no merit in the contention. It seems that when the judge at the bench indicated that appellant might argue to the jury on the basis of the paper in question it was not clear that counsel would argue it effected expatriation rather than that it was a circumstance on the question of coercion. When the argument was made that they might find expatriation it was proper for the judge to straighten out the matter as he did. There is no reason for us to believe that this in any way significantly prejudiced counsel's status with the jury.

We find no reversible error and the judgment accordingly is

Affirmed.