# Extraterritorial Effect of the Posse Comitatus Act

The Posse Comitatus Act does not apply outside the territory of the United States.

Although some language in Department of Defense regulations suggests that certain restrictions on the use of military assistance apply outside the land area of the United States, the better view is to read those regulations consistently with provisions in the underlying statute, passed subsequently to the Posse Comitatus Act, stating that no limitations beyond those imposed by the Posse Comitatus Act were intended to be enacted.

November 3, 1989

MEMORANDUM OPINION FOR THE ASSISTANT TO THE PRESIDENT
FOR NATIONAL SECURITY AFFAIRS

You have asked for our advice whether the Posse Comitatus Act, 18 U.S.C. § 1385, applies outside the territory of the United States. We conclude that it does not. Neither the language, history, nor legislative history of the Act suggests that Congress intended for the Act to apply extraterritorially. Under these circumstances, established rules of statutory construction impose a presumption that the Act is to be construed as having only domestic effect. Such a construction is necessary to enable criminal laws with extraterritorial effect to be executed and to avoid unwarranted restraints on the President's constitutional powers. Additional legislation and accompanying Department of Defense regulations authorizing certain types of military assistance to civilian authorities contain some suggestion that restrictions on military assistance enumerated therein apply outside the land area of the United States. We believe, however, that the better view is that these rules must be read consistently with other provisions in the same legislation providing that no limitations beyond those imposed by the Posse Comitatus Act were intended to be enacted. The scope of the regulations will be subject to some uncertainty, however, until they are amended to expressly state these limits on their scope.

## I. The Posse Comitatus Act

*A. The Text of the Posse Comitatus Act Suggests the Act Applies Only Domestically.*

The Posse Comitatus Act provides:

321

> Whoever, except in cases and under circumstances
> expressly authorized by the Constitution or Act of
> Congress, willfully uses any part of the Army or the Air
> Force as a posse comitatus or otherwise to execute the
> laws shall be fined not more than $10,000 or imprisoned not
> more than two years, or both.

18 U.S.C. § 1385. The statute prohibits both the use of the Army or Air Force as a posse comitatus and to "otherwise ... execute the laws." The first prohibition, on the use of the military as a posse comitatus, by definition should apply only domestically. A posse comitatus is defined as: "The power or force of the county; the entire population of a county above the age of fifteen, which a sheriff may summon to his assistance in certain cases, as to aid him in keeping the peace, in pursuing and arresting felons, etc." *Black's Law Dictionary* 1046 (5th ed. 1979). This power of the local sheriff was well established in the United States in the nineteenth century, *see, e.g., Coyles v. Hurtin*, 10 Johns. 85 (N.Y. 1813); *Sutton v. Allison*, 47 N.C. 339 (1855), and had long been held to be available to United States Marshals within their districts. The power had been construed to include the right to call upon military personnel within the jurisdiction to aid civil enforcement efforts. *See, e.g.,* 16 Op. Atty. Gen. 162, 163 (1878) ("It has been the practice of the Government since its organization (so far as known to me) to permit the military forces of the United States to be used in subordination to the marshal of the United States when it was deemed necessary that he should have their aid in order to the enforcement of his process."). Thus, the portion of the Act prohibiting use of the military as a posse comitatus is a limitation on the power of civil enforcement authorities to include the military within the forces available for domestic law enforcement. As such, this portion of the Act logically has no relevance to law enforcement efforts conducted outside the territory of the United States.

The statute also prohibits the use of the Army or Air Force to "otherwise ... execute the laws." The structure of the Act suggests that this prohibition should be read in conjunction with the specific prohibition on use of the military as a posse comitatus. "Under the rule of ejusdem generis, where general words follow an enumeration of specific items, the general words are read as applying only to other items akin to those specifically enumerated." *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980). In this context, the doctrine of ejusdem generis would direct that the words "or otherwise to execute the laws" should be read to refer to actions similar to those of including the military within a posse comitatus. Under this rationale, the "or otherwise" phrase, like the specific prohibition, should be read to have only domestic effect. *See Huguley Mfg. Co. v. Galeton Cotton Mills*, 184 U.S. 290, 295 (1902) (reading phrase "by certiorari or otherwise" in Supreme Court jurisdictional statute to "add

nothing to our power, for if some other order or writ might be resorted to, it would be ejusdem generis with certiorari"); *see also* J. Sutherland, *Statutes and Statutory Construction* § 273 (1891) ("The words 'other persons' following in a statute the words 'warehousemen' and 'wharfinger,' must be understood to refer to other persons *ejusdem generis, viz.,* those who are engaged in a like business.").

Thus, although the text does not expressly address whether the Act is to apply extraterritorially, the definition of the Act's key concept, together with the structure of the text, indicates that the Act has a strongly domestic orientation. This interpretation of the text is confirmed by an examination of the history surrounding the passage of the Posse Comitatus Act and well settled canons of construction concerning the extraterritorial application of federal legislation.

### B. The History and Purposes of the Posse Comitatus Act Indicate That the Act was Intended Only to Address the Relationship Between the Military and Domestic Civil Authority.

The immediate impetus for the passage of the Posse Comitatus Act as a rider to the Army Appropriations Act of 1878 was the deep resentment of Southern Democrats toward the use of the federal military in the reconstruction period. After their surrender, the southern states were divided into military districts under the command of Army generals, who oversaw voter registration and supervised the election of delegates who organized the new state governments that would ratify the Fourteenth Amendment. *See generally* Major H.W.C. Furman, *Restrictions on the Use of the Army Imposed by the Posse Comitatus Act ("Restrictions"),* 7 Mil. L. Rev. 85, 93-94 (1960). The United States Army was also used extensively between 1866 and 1872 to suppress violent encounters between ex-Confederate soldiers and freedmen and to deter and punish the activities of the Ku Klux Klan and other secret societies. *See* Office of the Judge Advocate General, *Federal Aid in Domestic Disturbances,* S. Doc. No. 263, 67th Cong., 2d Sess. 90-155 (1923). Southern resentment of federal military interference reached a high water mark during the presidential election of 1876, when over 7000 deputy marshals were used to supervise the election, and President Grant ordered federal troops to the polling places in Louisiana, Florida, and South Carolina to prevent fraud and voter intimidation. *See Restrictions* at 90-91; Walter E. Lorence, *The Constitutionality of the Posse Comitatus Act ("Constitutionality"),* 8 U. Kan. City L. Rev. 164, 169-74 (1940).

In December 1876, the House of Representatives passed a resolution requesting that the President submit a report to Congress on the use of the Army in the 1876 election. The actions of the President were roundly criticized in the democratically controlled House, with Members expressing concern that "there has been a constant and persistent interference in

323

State matters by the Army." 5 Cong. Rec. 2117 (1877) (remarks of Rep. Banning); *see also id.* at 2112 ("American soldiers policemen! Insult if true, and slander if pretended to cover up the tyrannical and unconstitutional use of the Army by protecting and keeping in power tyrants whom the people have not elected.") (Remarks of Rep. Atkins). In response to these concerns, a rider was added to the Army appropriations bill prohibiting the use of the Army "in support of the claims, or pretended claim or claims, of any State government, or officer thereof, in any State, until such government shall have been duly recognized by Congress." *Id.* at 2152. The Senate deleted the rider, and when the House refused to recede from its position on the issue, the forty-fourth Congress adjourned without passing an Army appropriations provision. *See generally* Deanne C. Siemer & Andrew S. Effron, *Military Participation in United States Law Enforcement Activities Overseas: The Extraterritorial Effect of the Posse Comitatus Act ("Extraterritorial Effect")*, 54 St. Johns L. Rev. 1, 18-20 (1979).[1]

In the forty-fifth Congress, Congressman Kimmel proposed an amendment to the Army appropriations bill providing:

> [I]t shall not be lawful to use any part of the land or naval forces of the United States to execute the laws either as a *posse comitatus* or otherwise, except in such cases as may be expressly authorized by act of Congress.

7 Cong. Rec. 3586 (1878). Kimmel's statement introducing the amendment identified two major concerns. First, quoting extensively from the writings of the Framers, he noted the danger to liberty of maintaining a large standing army at home in time of peace. Kimmel argued that under the Constitution, "the militia [is] to be a substitute for a standing army. The militia" — not the Army — "was to be called out to execute the laws, to suppress smugglers and insurrection, to quell riot and repel invasion." *Id.* at 3579. He contrasted the war powers in Article I, Section 8, Clauses 11-14, with the powers of the militia in Article I, Section 8, Clauses 15 and 16. "These two powers are as distinct as are the means to be employed for the exercise of them, the Army for the defense against external foes, the militia for the suppression of internal resistance." *Id.* at 3581. "By this cautious adjustment of these balances did the fathers ... provide against intervention by the standing army, if such should exist, *in the internal government of the country ....*" *Id.* (emphasis added).

---

[1] Further debate continued during a special session of Congress to reconsider the appropriations bill. 6 Cong. Rec. 50 (1877). Although no amendment was passed, a number of democratic Congressmen indicated that they hoped that some limitation on the use of the military in civilian law enforcement would be forthcoming from the next regular session of Congress. *Id.* at 338 (Rep. Atkins), *id.* at 294 (Rep. Singleton); *id* at 298 (Congressman Pridemore)

Next Kimmel criticized the use of the Army in calls to posse comitatus. He argued that this power had never in fact existed, rejecting an opinion of Attorney General Cushing that he characterized as an "attempt to clothe the marshals, the lowest officers of the United States courts, with authority to use a standing army as a *posse comitatus*." *Id.* at 3582. He referred to the use of the army in suppressing labor strikes, in the execution of revenue laws, and in the "execution of the local laws" at the behest of "all sorts of people." *Id.* at 3581. Kimmel also described the use of the Army in the election of 1876 and argued that "shielded by the power of standing armies, tyrants have reconstructed the governments of States, imposed constitutions on unwilling people, obstructed the ballot by soldiers at the polls, ... [and] placed soldiers in the capitols of [the] States and excluded the representatives of the people." *Id.* at 3586. He offered the amendment "to restrain the Army so that it may not be used as a *posse comitatus* without even the color of law," *id.*, and expressed the hope that at future sessions the militia could be improved and expanded, thus "obviat[ing] [the need] for any but a very small standing Army." *Id.* These remarks indicate that Congressman's Kimmel's amendment was intended to address concerns that were wholly domestic in nature. In specifically distinguishing between internal operations, which were the province of the local police and the state militia, and external operations, which were the province of the federal military, Kimmel highlighted the domestic nature of the proposed prohibition on use of the federal forces.[2]

The version of the army appropriations bill that ultimately was passed by the House contained the following substitute, offered by Congressman Knott, for the Kimmel amendment:

> From and after the passage of this act it shall not be lawful to employ any part of the Army of the United States as a *posse comitatus* or otherwise under the pretext or for the purpose of executing the laws, except in such cases and under such circumstances as such employment of said force may be expressly authorized by act of Congress; and no money appropriated by this act shall be used to pay any of the expenses incurred in the employment of any troops in violation of this section; and any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by [a] fine not exceeding $10,000 or imprisonment not exceeding two years, or by both such fine and imprisonment.

---

[2] Indeed, Kimmel specifically alluded to the Indian problem, indicating that Spain and England had incited the Indians to "depredations, arson, and murder," against American citizens, and assumed the Army had a role to play in their suppression *Id* at 3584-85 *See Extraterritorial Effect*, 54 St. Johns L. Rev at 28 ("[T]he strong preference for the role of the states in law enforcement underscores the absence of an express intention—at least on the part of the sponsor of this amendment—that the Act have extraterritorial application.").

*Id.* at 3845. Knott echoed the concerns that had been expressed by Congressman Kimmel. *Id.* at 3846, 3849. He stated that "this amendment is designed to put a stop to the practice, which has become fearfully common, of military officers of every grade answering the call of every marshal and deputy marshal to aid in the enforcement of the laws." *Id.* at 3849. He stated that he did not object to the use of federal troops when acting under constitutional authority to suppress insurrection or rebellion (presumably a reference to Article IV, Section 4), but simply believed that "[t]he subordination of the military to the civil power ought to be sedulously maintained." *Id.* There was essentially no debate concerning extraterritorial application of the Knott amendment,[3] and it was passed by the House as introduced. *Id.* at 3852.

In the Senate, the same concerns about use of the military as a *posse comitatus* were expressed, along with some other concerns. Senator Kernan offered an amendment for Senator Bayard that proposed to retain the Knott amendment with one important change. He suggested that the exceptions clause be amended to reach cases where the use of military force was "expressly authorized *by the Constitution* or by act of Congress." Kernan made clear that this change was to encompass the President's power under Article IV, Section 4 to use the federal military when called upon to do so by the legislature or a State governor. Kernan reiterated that the amendment was designed to address the problem of *posse comitatus*:

> It would be an entire overthrow, it seems to me, of a fundamental principle of the laws of this country, of all our traditions, to say that the Army at the instance of the law officer, through a marshal or a deputy, special or general, of election, may call a body of the Army as a *posse comitatus* and order it about the polls of an election. We all know that might be used for an entire overthrow of the rights of citizens at the polls.... Hence I think Congress should say that there shall be no right to use the Army as a *posse comita-*

---

[3] The only discussion that arguably touched upon foreign affairs was raised by an amendment proposed by Congressman Schleicher of Texas which read: "*Provided,* That this section [the Knott amendment] shall not apply on the Mexican border or in the execution of the neutrality law elsewhere on the national boundary line." 7 Cong. Rec. 3848 (1878). Schleicher was concerned with the robbery of cattle and that the Knott amendment would end the practice of having civilian authorities accompany military scouts on border patrol to arrest Mexican rustlers. He also expressed concern that civil and military cooperation might be necessary at the Canadian border to enforce the neutrality laws, if, for instance, Russia were to go to war with England. The Schleicher amendment was defeated by voice vote. *Id.* at 3849. The intent of the amendment is not entirely clear, but at least one commentator has concluded that the proposal assumed the Knott amendment *would not* apply *outside* the borders of the United States and that it sought to establish a further exempted zone just inside the border See *Extraterritorial Effect*, 54 St Johns L. Rev at 32 ("[T]he language of the [Schleicher] proviso — 'on the national boundary line' — suggests a domestic orientation to the proviso, and an implicit understanding that the Posse Comitatus amendment had no application across the border.").

> *tus* by the peace officers of the State or the General
> Government unless there is some statutory or constitution-
> al provision that authorizes it.

*Id.* at 4240. Senator Beck agreed and indicated that "the whole object of this section as amended is to limit the use by the marshals of the Army to cases where by law they are authorized to call for them, and not to assume that they are in any sense a posse comitatus to be called upon when there is no authority given them to call upon anything but the *posse comitatus.*" *Id.* at 4241. Thus, discussion of the Act in both houses makes clear that the restriction on the use of the military as a posse comitatus was directed solely at problems of local civil law enforcement.

Debates in the Senate on other portions of the amendment likewise reveal no intent for the prohibition on use of the military *other than* as a posse comitatus to bar extraterritorial military operations to execute the laws. Nowhere was such an intent expressed in the legislative history. Moreover, the discussions on this portion of the provision demonstrate that no limitation on the President's constitutional powers was intended. Senator Windom noted that "the discussion thus far has proceeded on the assumption that it was only when the Army was used as a *posse comitatus* that [i]t was [forbidden]. But the section says 'when used as a *posse comitatus* or otherwise;' whether used in that way, or as a portion of the Army, it is forbidden." *Id.* at 4241. Senator Sargent replied that "it ought to be forbidden *unless it is according to the Constitution and the laws.*" *Id.* (emphasis added). Eventually, the Senate narrowly defeated an amendment to delete the words "or otherwise" from the Act. *Id.* at 4304. Several Senators expressed the view, however, that the amendment's restriction on the use of the military to situations where "express" con- stitutional or statutory authority existed was an unconstitutional limita- tion on the President's powers as chief executive and Commander in Chief. *See id.* at 4241 (remarks of Sen. Edmunds); *id.* at 4242 (remarks of Sen. Hoar). Senator Bayard, the original sponsor of the Senate version of the amendment, defused this debate by stating he would agree to a clari- fying amendment striking the word "expressly" since, in his view, the pro- vision as proposed did not entail "a diminution of any power under the law or the Constitution." *Id.* at 4244.

After additional debates on other portions of the language, the Act was passed by both Houses with the exception for constitutional authority suggested by Senator Kernan. There was little debate on the conference reports, and the Act became law on June 18, 1878. *See* Act of June 18, 1878, ch. 264, 20 Stat. 152 (1878).

As this summary indicates, none of the Act's extensive legislative histo- ry suggests any intent to constrain the use of the military outside the ter- ritorial jurisdiction of the United States. Rather, the history makes clear that the prohibition on use of the military as a posse comitatus was aimed

327

at preventing the use of the military for *local* civilian law enforcement. The governing principles were the traditional American aversion to maintaining a standing army at home, the longstanding principle that civilians should control domestic governance, and a concern that the extensive use of federal military power in domestic affairs violated the sovereignty and independence of the several states. None of these concerns is implicated by the use of the military to enforce the laws of the United States abroad. Military enforcement activities on the high seas or in the jurisdiction of foreign powers cannot by definition clash with or derogate from the authority of state and local police authorities or the National Guard.[4]

Moreover, both the structure of the Act and its legislative history indicate that the phrase "or otherwise to execute the laws" was also aimed at other domestic law enforcement activities, such as the suppression of labor strikes in the East and the enforcement of the revenue laws and destruction of untaxed stills in the West.[5] The Act in essence is a statement of principle concerning the relationship of domestic civil authority to the military power; any suggestion that its restrictions were intended to apply abroad is negated by this central purpose.

Consistent with this conclusion is the absence in the Act's legislative history of any evidence of an intent to limit the Executive's freedom to act in the area of foreign affairs. To the contrary, in introducing the amendment that was to become the Posse Comitatus Act, Congressman Kimmel drew a clear distinction between the domestic and foreign powers of the federal government and indicated that the amendment dealt only with the former. 7 Cong. Rec. 3581 (1878); *see supra* pp. 324-25. Construing the Act to apply to extraterritorial law enforcement activities would raise serious questions about infringements on the President's inherent constitutional powers. *See infra* pp. 331-34. Yet there was no discussion in the legislative history concerning the effect the Act might have on the power of the President to enter into bilateral or international agreements concerning law enforcement or to use the military in executing those agreements. *See Extraterritorial Effect*, 54 St. Johns L. Rev. at 45 ("With respect to extraterritoriality, Congress, in this debate, did not exhibit concern about the use of troops in terms of the President's war powers or otherwise in furtherance of American foreign policy.").

---

[4] The National Guard is the modern day form of the State militia. *See Maryland v. United States*, 381 U.S 41, 46 ("The National Guard is the modern Militia reserved to the States by Art I, § 8, cl. 15, 16 of the Constitution."), *judgment vacated and amended*, 382 U.S. 159 (1965).

[5] All the references in the debate to military law enforcement outside of the context of posse comitatus were domestic in nature. These included the use of federal troops in the election process and electoral politics. *See, e g.*, 7 Cong. Rec. 3585 (1878) (Rep Kimmel); *id.* at 3676 (Rep Hewitt); *id.* at 3677 (Rep. Mills). Concern was also voiced about the use of the military to deal with labor unrest *See id.* at 3676 (Rep Bridges); *id.* at 3683-84 (Rep. Cox). Finally, supporters of the Posse Comitatus Act decried the use of the military to enforce the revenue laws, particularly as they applied to untaxed liquor. *See id.* at 3581 (Rep. Kimmel) None of these examples suggests anything but a domestic orientation to the phrase "or otherwise to execute the laws"

Under these circumstances, it would be absurd to conclude that the drafters of the Act wished to prohibit use of the military to execute the laws abroad when, as will often be the case overseas, the military is the only effective force available to the executive branch to "take care that the laws be faithfully executed."[6] In a number of instances extraterritorial application of the Posse Comitatus Act would require the assumption that Congress wished certain criminal laws to be practically unenforceable.[7] Indeed, if the Act were automatically and unthinkingly applied to extraterritorial law enforcement situations, it could impose criminal penalties on foreign civil authorities who requested or assisted American military forces in the execution of the laws. *See Restrictions*, 7 Mil. L. Rev. at 98 (indicating that the criminal sanction would apply to civilian officials who request and receive military aid in violation of the Act). Such an absurd result should not be inferred.

*C. The General Presumption Against Extraterritorial Application of Criminal Statutes Further Supports Solely Domestic Application of the Posse Comitatus Act.*

Our conclusion that the Posse Comitatus Act should not be applied extraterritorially is confirmed by the general rule of statutory construction concerning the extraterritorial application of domestic legislation. In sum, that rule states:

> Rules of United States statutory law, whether prescribed by federal or state authority, apply only to conduct occurring

---

[6] Numerous supporters of the Posse Comitatus Act expressed the view that it did not restrict the President's power to employ the military for domestic law enforcement when federal or state civil authorities were incapable of maintaining order. *See, e g*, 7 Cong Rec 3645 (1878) (Rep Calkins) ("Now, it is admitted on all hands that there ought to be some reserved power or force to repress or suppress these insurrections when they take place or which are likely to take place, and which may pass beyond the control of a sheriff's *posse comitatus*."); *id* at 4247 (Sen Hill) ("The military puts down opposition to the execution of the law when that opposition is too great for the civil arm to suppress "); *id* at 4243 (Sen. Merrimon) (indicating that use of the military was not proper "until [the] civil power was exhausted") Thus, even in the domestic sphere, the legislators did not intend the Act to extend to situations where only the discipline and armed strength of the military could assure execution of the laws *See Extraterritorial Effect*, 54 St. Johns L. Rev at 44 ("[I]f the Federal government has authority to act, and necessity requires the application of military force, then it could be used .")

[7] Recent legislation reflects Congress's intent that the United States be able to exercise its law enforcement powers abroad when necessary to counter international terrorism. For example, in introducing legislation (now codified at 18 U S.C. § 2331) to criminalize murder and other acts committed against U.S. nationals abroad, Senator Specter noted that:

> In many cases, the terrorist murderer will be extradited or seized with the cooperation of the government in whose jurisdiction he or she is found Yet, if the terrorist is hiding in a country like Lebanon, where the government, such as it is, is powerless to aid in his removal, or in Libya, where the government is unwilling, we must be willing to apprehend these criminals ourselves and bring them back for trial.

131 Cong. Rec. 18,870 (1985) In the hypothetical situations posed by Senator Specter, enforcement of 18 U S.C. § 2331 likely would be a practical impossibility without extensive military involvement in the arrest and return of the offenders to the United States.

> within, or having effect within, the territory of the United
> States, unless the contrary is clearly indicated by the statute.

Restatement (Second) of Foreign Relations Law of the United States § 38 (1965). *Accord* 1 Restatement (Third) of the Foreign Relations Law of the United States § 403 cmt. g (1987).

The Supreme Court has consistently applied this principle in construing both civil and penal statutes of the United States. In *American Banana Co. v. United Fruit Co.*, 213 U.S. 347 (1909), the Supreme Court upheld the dismissal of a complaint under the Sherman Act that alleged actions in restraint of trade wholly within the jurisdiction of Costa Rica. Despite the broad language of the Sherman Act prohibiting "[e]very contract in restraint of trade" and applying to "[e]very person who shall monopolize," the Court rejected extraterritorial application based on considerations of international sovereignty and comity. Justice Holmes' opinion for the Court indicated that these considerations "would lead in case of doubt to a construction of any statute as intended to be confined in its operation and effect to the territorial limits over which the lawmaker has general and legitimate power. All legislation is *prima facie* territorial." *Id.* at 357 (citation and internal quotation marks omitted).

The Court elaborated on the presumption that federal law applies only territorially in the context of a penal statute in *United States v. Bowman*, 260 U.S. 94 (1922). At issue in *Bowman* was the extraterritorial application of a criminal statute that was "directed generally against whoever presents a false claim against the United States, knowing it to be such, to any officer of the civil, military or naval service or to any department thereof, or any corporation in which the United States is a stockholder." *Id.* at 101.

The Supreme Court viewed the question of extraterritorial application as one of "statutory construction" and indicated that "[t]he necessary *locus*, when not specifically defined, depends upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a government to punish crimes under the law of nations." *Id.* at 97-98. As to purely private crimes "which affect the peace and good order of the community," exclusively territorial application is the rule, and "[i]f punishment of them is to be extended to include those committed outside the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard." *Id.* at 98. But the Court indicated that a different rule would apply as to statutes that "are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers or agents." *Id.* As to these offenses, some "can only be committed within the territorial jurisdiction of the Government because of the local acts required to constitute them,"

while in other cases "to limit their *locus* to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity." *Id.*

As to the statute before it, the Court noted that it applied to false claims against any civil, military, or naval officer of the United States. Moreover, the statute had been amended in 1918 to include fraudulent claims against corporations in which the United States owned stock. Because the amendment was, in the Court's view, intended to protect the United States as sole stockholder in the Emergency Fleet Corporation, and because "that corporation was expected to engage in, and did engage in, a most extensive ocean transportation business, and its ships were seen in every great port of the world open during the war," *id.* at 102, congressional intent to provide for extraterritorial application could be inferred both from the nature of the crime and from the fact that a refusal to give such effect to the statute would have significantly undermined its purpose.

In contrast, in *Foley Bros., Inc. v. Filardo*, 336 U.S. 281 (1949), the Court invoked the presumption against extraterritorial scope in holding that the so-called "Eight Hour Law" had only domestic application. On its face, that law broadly applied to "[e]very contract made to which the United States ... is a party" and "every laborer and mechanic employed by any contractor." The Court concluded, however, that it did not apply to a contract between the United States and a private contractor for construction work undertaken in Iraq and Iran, because it found that "concern with *domestic* labor conditions led Congress to limit the hours of work." *Id.* at 286 (emphasis added).[8]

We think it clear that in the case of the Posse Comitatus Act, there is insufficient evidence to rebut the presumption against extraterritorial application. The text of the statute itself suggests a wholly domestic orientation, and the legislative history strongly supports that view. In the words of the Supreme Court in *Bowman*, the Posse Comitatus Act proscribes conduct "which affect[s] the peace and good order of the community." 260 U.S. at 98. There is no indication that declining to give the Act extraterritorial effect wuld frustrate the purposes of the Act or "greatly to curtail the scope and usefulness of the statute and leave open a large immunity." *Id.*

---

[8] The Court recently reaffirmed the *Foley Bros.* approach to extraterritoriality in *Argentine Republic v Amerada Hess Shipping Corp.*, 488 U S. 428 (1989) There the Court invoked the presumption against extraterritorial application in holding that the word "waters" in an exception to the Foreign Sovereign Immunities Act, 28 U S C §§ 1602-1611, should be strictly construed to mean the territorial waters of the United States. 488 U S at 440.

## D. Broadly Construing the Posse Comitatus Act to Include Actions of Military Personnel Abroad Would Raise Serious Constitutional Concerns.

Reading the Posse Comitatus Act to apply extraterritorially also would infringe on the President's inherent constitutional powers as Chief Executive and Commander-in-Chief of the armed forces both to execute the laws and to conduct foreign policy. *See* U.S. Const. art. II, § 1 (executive power vested in the President); art. II, § 2 (President is the Commander-in-Chief of the armed forces); art. II, § 3 (President must "take Care that the Laws be faithfully executed"). In The Federalist, Alexander Hamilton explained why the President's executive power would include the conduct of the nation's foreign policy: "The essence of the legislative authority is to enact laws, or, in other words to prescribe rules for the regulation of the society; while the execution of the laws and the employment of the common strength, either for this purpose or for the common defense, seem to comprise all the functions of the executive magistrate." The Federalist No. 75, at 450 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Thomas Jefferson expressed a similar view: "The transaction of business with foreign nations is executive altogether; it belongs, then, to the head of that department, except as to such portions of it as are specifically submitted to the Senate. Exceptions are to be construed strictly ...." 5 *Writings of Thomas Jefferson* 161 (W. Ford ed. 1895).

While the domestic powers of the national government were specifically enumerated to protect the independence and domestic legislative prerogatives of the states, the individual states never possessed the foreign powers of an independent nation. These inherent powers, which are an aspect of national sovereignty, were always contained in the national government. *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936). Echoing the remarks of Hamilton and Jefferson quoted above, the Court in *Curtis-Wright* concluded that most of these implied powers are lodged within the executive branch. The Court referred to "the very delicate, plenary, and exclusive power of the President as the *sole organ of the federal government in the field of international relations* — a power which does not require as a basis for its exercise an act of Congress." *Id.* at 320 (emphasis added).

The convergence of the President's inherent powers under the Constitution in the area of foreign affairs and his power as Commander-in-Chief of the armed forces produce the constitutional right and duty in some instances to enforce American law outside the territorial jurisdiction of the United States.[9] Absent valid statutory constraints, the

---

[9] The President's duty to protect American citizens and property can arise even in the absence of a specific statute that must be executed. *See In re Neagle*, 135 U S 1, 63-67 (1890) (recognizing the President's power to protect the nation or citizens or property of the United States even where there is no specific statute to "execute")

Constitution also provides the President with the means necessary to execute the laws, including, where necessary, the use of United States military forces. *See, e.g., Little v. Barreme,* 6 U.S. (2 Cranch) 170, 177 (1804) (Marshall, C.J.) ("It is by no means clear that the President of the United States, whose high duty it is to 'take care that the laws be faithfully executed,' and who is commander in chief of the armies and navies of the United States, might not, without any special authority for that purpose ... have empowered the officers commanding the armed vessels of the United States, to seize and send into port for adjudication, American vessels which were forfeited by being engaged in this illicit commerce."); *In re Cooper,* 143 U.S. 472, 499-500 (1892) (seizure by U.S. Navy of British vessel on the high seas for violation of U.S. law); *see also* Joseph Story, 3 *Commentaries on the Constitution* 1485 (1833) ("The command and application of the public force, to execute the laws, to maintain peace, and to resist foreign invasion, are powers so obviously of an executive nature, and require the exercise of qualities so peculiarly adapted to this department, that a well-organized government can scarcely exist, when they are taken away from it.").

Throughout our history, Presidents have exercised the power to call upon the military to execute and enforce the law when the civilian officers under their control have proved inadequate to the task. *See In re Debs,* 158 U.S. 564, 582, 599 (1895) (affirming executive power to use the military to prevent violent obstruction of interstate commerce); 41 Op. Att'y Gen. 313, 326 (1957) (discussing President's constitutional authority to enforce a judicial desegregation decree with military power in Little Rock, Arkansas); *see generally* Guido N. Lieber, *The Use of the Army in Aid of the Civil Power* (1898). Moreover, the executive branch has often employed the military forces abroad to protect citizens of the United States and to punish violations of American law. *See* generally Milton Offutt, *The Protection of Citizens Abroad by the Armed Forces of the United States* (1928). As one commentator puts it,

> Congress alone, of course, has the right to declare war under the Constitution, but interposition for the protection of citizens is not essentially war .... So long as the use of the army and navy of the United States for the protection of citizens resident in foreign countries does not amount to a recognized act of war, it seems to be an established fact that the President does, constitutionally, possess the power to make such use of those forces, and that Congress, except indirectly, as by disbanding the army and navy, may not prevent or render illegal his action.

*Id.* at 4-5.

Under these principles, construing the Posse Comitatus Act to limit the authority of the President and his designates to employ the military for law enforcement purposes outside the territorial jurisdiction of the United States would impermissibly infringe on the core constitutional responsibilities of the Executive. On foreign soil or the high seas — unlike in the domestic situation — military personnel may constitute the only means at the executive branch's command to execute the laws. Giving extraterritorial effect to the Posse Comitatus Act thus could, in many circumstances, deprive the executive branch of any effective means to fulfill this constitutional duty. Such a deep intrusion into the functions of the executive branch would present serious questions of constitutionality, *see Morrison v. Olson*, 487 U.S. 654 (1988), and it is likely that the federal courts would be "loath to conclude that Congress intended to press ahead into dangerous constitutional thickets in the absence of firm evidence that it courted those perils." *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 446 (1989). *See also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 645 (1952) (Jackson, J., concurring) ("I should indulge the widest latitude of interpretation to sustain [the President's] exclusive function to command the instruments of national force, at least when turned against the outside world for the security of our society.").

E. *The Decisions of the Federal Courts, Administrative Practice, and the Views of Commentators in the Field All Support the Conclusion that the Posse Comitatus Act Applies Only Within the Territorial Jurisdiction of the United States.*

Courts and commentators generally agree that the Posse Comitatus Act does not apply extraterritorially. Several cases have addressed the issue; none has concluded that the Act so applies. In *Chandler v. United States*, 171 F.2d 921 (1st Cir. 1948), *cert. denied*, 336 U.S. 918 (1949), the court squarely held that the Posse Comitatus Act does not apply extraterritorially. There, an American citizen was prosecuted for treason committed in Nazi Germany during World War II. Chandler was indicted in the United States in 1943, and in 1946 he was arrested by the Army in Bavaria at the request of the Department of Justice. He was taken into military custody and flew with an Army guard to the United States where he was tried and convicted. *Id.* at 927-28.

On appeal, Chandler argued that the district court had no jurisdiction because his arrest and return to the United States by Army personnel violated the Posse Comitatus Act. *Id.* at 934. The Court of Appeals disagreed. The court noted that "the immediate objective of the [Posse Comitatus Act] was to put an end to the use of federal troops to police state elections in the ex-Confederate States where the civil power had been reestablished." *Id.* at 936. Invoking the presumption against the extraterritorial application of congressional legislation and citing *Bowman*, the court stated:

> In contrast to the criminal statute denouncing the crime of treason, this is the type of criminal statute which is properly presumed to have no extraterritorial application in the absence of statutory language indicating a contrary intent. Particularly, it would be unwarranted to assume that such a statute was intended to be applicable to occupied enemy territory, where the military power is in control and Congress has not set up a civil regime.[10]

*Id.* (citations omitted). The court also noted the practical impossibility of apprehending a fugitive like Chandler absent military assistance and observed that it found wholly unacceptable the conclusion "that there was no way in which a court of the United States could obtain lawful jurisdiction over Chandler unless he should choose to relinquish his asylum in Germany and voluntarily return to the United States." *Id.*

Two years after *Chandler*, the Court of Appeals for the District of Columbia Circuit was presented with an almost identical factual scenario in *Gillars v. United States*, 182 F.2d 962 (D.C. Cir. 1950). The court followed *Chandler* and rejected the argument that the defendant's arrest in occupied Germany by U.S. military forces violated the Posse Comitatus Act. However, it based its decision only on the narrower ground suggested by *Chandler:* that the U.S. Army was the only civil authority in Germany. *Id.* at 972-73. The *Gillars* court expressly declined to reach the general question whether the Act was extraterritorial in scope. *Id.* at 973. *Accord D'Aquino v. United States*, 192 F.2d 338, 351 (9th Cir. 1951) (based on *Chandler* and *Gillars*, court summarily rejected American citizen's claim that her arrest by military authorities and transportation to the United States for trial violated the Posse Comitatus Act), *cert. denied,* 343 U.S. 935 (1952).

More recently, decisions have raised, but not expressly decided, the question of the Act's extraterritorial application. In *United States v. Cotten,* 471 F.2d 744 (9th Cir.), *cert. denied,* 411 U.S. 936 (1973), two American civilians were indicted for defrauding the United States by passing checks in Vietnam drawn on a nonexistent account with the United States Military Exchanges. After being arrested in Vietnam by agents of the United States Naval Investigative Service and forcibly returned to the United States for trial by Air Force personnel, *id.* at 745, the defendants challenged the court's jurisdiction on the grounds that the Posse Comitatus Act had been violated and that the arresting officials' conduct was so shocking to the conscience as to violate the Due Process

---

[10] As the above quotation indicates, the Court of Appeals had earlier rejected Chandler's claim that the treason statute did not reach extraterritorial acts. The court noted that in defining the crime of treason in the Constitution, the Framers had discussed extraterritorial application and specifically rejected language that would have restricted treason to domestic acts. 171 F.2d at 929-31. The court also noted that the treason statute itself proscribed aid to government enemies "within the United States *or elsewhere.*" *Id* at 930 (quoting 18 U.S.C § 2381) (emphasis added).

335

Clause. Relying on the so-called *Ker-Frisbie* doctrine, which provides that an illegal arrest does not divest a court of jurisdiction over the defendant's person, *see Frisbie v. Collins*, 342 U.S. 519 (1952); *Ker v. Illinois*, 119 U.S. 436 (1886), the court rejected their claims without addressing whether the Posse Comitatus Act had been violated.

*United States v. Yunis*, 681 F. Supp. 891 (D.D.C. 1988), *aff'd*, 924 F.2d 1086 (1991), is the only decision that is somewhat ambiguous on the extraterritorial reach of the Act and related Department of Defense regulations. That case involved a hijacker who was arrested abroad and returned to the United States by the U.S. Navy for trial. After describing other cases dealing with challenges based upon the Posse Comitatus Act, including *Chandler* and its progeny, the court rested its decision that the Act had not been violated on the ground that Navy personnel had played a "passive role[]" in the operation and did not engage in "the exercise of regulatory, proscriptive, or compulsory military power" of the kind that the Department of Defense regulations were meant to prohibit. *Id.* at 895. Although it could be argued from this basis for decision that the court assumed the regulations applied extraterritorially, in fact the court never directly addressed the issue. Moreover, it noted that *Chandler* had held that the Posse Comitatus Act "'is properly presumed to have no extraterritorial application in the absence of statutory language indicating a contrary intent.'" *Id.* at 893 (quoting *Chandler*, 171 F.2d at 936). In addition, the court observed that in the case before it, the military was "aiding law enforcement efforts of FBI agents in international waters, where no civil governmental authority existed," *id.* at 891, and indicated concern that "[b]y its very nature, the operation required the aid of military located in the area." *Id.* at 895. Under these circumstances, we do not believe that *Yunis* properly can be understood to hold that the Posse Comitatus Act applies extraterritorially.

The administrative practice of the Army further supports the view that the Posse Comitatus Act is without extraterritorial effect. On numerous occasions, the Office of the Judge Advocate General has concluded that the Posse Comitatus Act has no extraterritorial application, and that office has approved law enforcement activities overseas that likely would violate the Act if performed by military personnel in the United States. *See, e.g.*, JAGA 1957/2176, March 6, 1957 (approving the taking of a statement from a suspect in Germany by military personnel and indicating that "[t]he so-called Posse Comitatus Act need not be considered as it is without extraterritorial application"). Accord JAGA 1954/5140, June 10, 1954 (approving use of military personnel to aid New Jersey State Police in identifying a suspect in Korea); JAGA 1954/6516, July 29, 1954 (approving use of military personnel to administer lie detector test on suspect in Europe).

Commentators in the area generally agree. *See, e.g., Restrictions*, 7 Mil. L. Rev. at 108 ("[I]t seems reasonably well-established that the Posse Comitatus Act imposes no restriction on employing the military services to enforce the law in foreign nations."). The most thorough scholarly

review of this topic, *Extraterritorial Effect*, one of whose authors is a former General Counsel for the Department of Defense, describes the primary purpose of the Posse Comitatus Act as "prevent[ing] the military from exercising those law enforcement responsibilities otherwise within the existing or potential capabilities of state forces and federal civilian offices." 54 St. Johns L. Rev. at 34. The article concludes that "neither the legislative history of the Act nor relevant principles of statutory construction require that the Act be given extraterritorial effect." *Id.* at 54.

Thus, we think it clear that the Posse Comitatus Act does not restrict the use of military personnel to enforce the laws outside the territorial jurisdiction of the United States. The text and history of the Act, as well as judicial, administrative, and scholarly interpretation of its provisions, all indicate that the Act was intended to deal with solely domestic concerns.

## II. Legislation Subsequent to the Posse Comitatus Act

*A. The 1981 Act*

In 1981, Congress enacted into law a series of statutory provisions relating to military cooperation with civilian law enforcement officials. Pub. L. No. 97-86, tit. IX, § 905(a)(1), 95 Stat. 1114 (1981) (codified at 10 U.S.C. §§ 371-378) (the "1981 Act").[11] The purpose of the 1981 Act was to enact provisions, including 10 U.S.C. §§ 371, 372, and 373, to give clear authority for certain types of military assistance to civilian authorities. These provisions codified well-established exceptions to the Posse Comitatus Act for the sharing of information collected by military personnel, the sharing of military equipment and facilities, and the training of civilian law enforcement agents by military personnel. *See* H.R. Rep. No. 71, 97th Cong., 1st Sess., pt. II, at 7 (1981) (These "sections clarify existing practices of cooperation between the military and civilian law enforcement authorities. Current interpretation of the Posse Comitatus Act already permits all of [this] activity.").

One provision of the 1981 Act bears particular relevance to the question of extraterritorial law enforcement by the military. Section 374, as enacted in the 1981 Act, generally permits use of Department of Defense personnel to operate and maintain equipment in connection with the enforcement of certain laws, including narcotics, tariff, and immigration laws. 10 U.S.C. § 374(a) (1982). Section 374(b) provides that generally, such military equipment may be operated by military personnel only to the extent that "the equipment is used for monitoring and communicating

---

[11] The provisions of the 1981 Act were substantially modified in 1988 For convenience, we cite the United States Code sections where the 1981 Act was codified as they existed prior to the 1988 amendments We discuss any effect the 1988 amendments may have on the extraterritoriality of the Posse Comitatus Act *infra* pp 340-41

the movement of air and sea traffic." *Id.* § 374(b). Section 374(c) then provides for special circumstances in which military equipment may be used outside the land area of the United States.[12]

Under ordinary principles of statutory construction, it might be argued that the express grant in section 374(c) of some authority to deploy equipment outside the United States implicitly denies authority for the military to engage in other more extensive activities. However, such an interpretation is expressly foreclosed by section 378 as enacted by the 1981 Act, which provides that the 1981 Act shall not be construed to limit the Executive's authority to use the military for civilian law enforcement efforts beyond the limitations previously imposed by the Posse Comitatus Act. *Id.* § 378. *Accord* H.R. Conf. Rep. No. 311, 97th Cong., 1st Sess. 122 (1981) (section 378 "clarifies the intent of the conferees that ... [n]othing in this chapter should be construed to expand or amend the Posse Comitatus Act"); *see also* H.R. Rep. No. 71, 97th Cong., 1st Sess., pt. II, at 12 n.3 (1981) ("Nothing in ... section [374] in any way affects the extraterritorial application, if any, of the Posse Comitatus Act."). Thus, while the 1981 Act functions as a grant of authority as well as a kind of "safe harbor" of permissible activities under the Posse Comitatus Act, it does not operate to restrict military enforcement activity beyond the limitations imposed by the Posse Comitatus Act itself. This interpretation accords with the general purpose of the 1981 Act to "clarify and reaffirm the authority of the Secretary of Defense to provide indirect assistance to civilian law enforcement officials." S. Rep. No. 58, 97th Cong., 1st Sess. 148 (1981).[13]

---

[12] Section 374(c) provides in pertinent part as follows

In an emergency circumstance, equipment operated by or with the assistance of personnel assigned under subsection (a) may be used *outside the land area of the United States (or any territory or possession of the United States)* as a base of operations by Federal law enforcement officials to facilitate the enforcement of a law listed in subsection (a) and to transport such law enforcement officials in connection with such operations, if—

    (A) equipment used by or with the assistance of personnel assigned under subsection (a) is not used to interdict or to interrupt the passage of vessels or aircraft; and

    (B) the Secretary of Defense and the Attorney General jointly determine that an emergency circumstance exists.

10 U.S.C § 374(c)(1)(A) & (B) (1982) (emphasis added)

[13] Although section 378 of the 1981 Act quite clearly indicates that "*[n]othing* in this chapter shall be construed to limit the authority of the executive branch in the use of military personnel," at least one court seems to have been confused as to the effect of the 1981 Act In *United States v Roberts*, 779 F.2d 565 (9th Cir.), *cert denied*, 479 U S 839 (1986), the Ninth Circuit addressed whether Navy assistance to Coast Guard interdiction of a vessel carrying marijuana on the high seas "violate[d] the proscriptions of 10 U S C. §§ 371-378 " *Id.* at 567. The *Roberts* court took the position that section 378 had the effect of codifying Navy regulations as of December 1, 1981, and then asked whether these regulations had been violated *Id.* There is absolutely nothing in the text or legislative history surrounding section 378 which would suggest that it was intended to codify past executive branch regulations Moreover, such an interpretation of section 378 would seem to construe that section *itself* "to limit the authority of the executive branch," in direct conflict with its plain language. Finally, such an interpretation would have the effect of expanding the restrictions of the Posse Comitatus Act, a result expressly disclaimed by the legislative history surrounding the 1981 Act.

This same analysis applies with respect to 10 U.S.C. § 375, as enacted by the 1981 Act, which provides:

> The Secretary of Defense shall issue such regulations as may be necessary to insure that the provision of any assistance (including the provision of any equipment or facility or the assignment of any personnel) to any civilian law enforcement official under this chapter does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in an interdiction of a vessel or aircraft, a search and seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law.

10 U.S.C. § 375 (1982). Given the explicit directive in section 378 that nothing in the 1981 Act is to be construed as creating additional restrictions on the Executive's authority to use the military to enforce the laws, we believe this section also should be interpreted to require the promulgation of regulations that do no more than enforce the Posse Comitatus Act. The House Report on the provision that became section 375 supports this view. It indicates that the section was intended to "reaffirm[] the traditionally strong American antipathy towards the use of the military in the execution of civil law" as contained in the Posse Comitatus Act. H.R. Rep. No. 71, pt. II, at 10-11 (quoting 7 Cong. Rec. 4245-47 (1878) (remarks of Sen. Hill concerning the Posse Comitatus Act)). The Conference Report on section 375 is even more explicit, stating:

> Nothing in this chapter adversely affects the authority of the Attorney General to request assistance from the Department of Defense under the provisions of 21 U.S.C. 873(b). *The limitation posed by this section is only with respect to assistance authorized under any part of this chapter.*

H.R. Conf. Rep. No. 311 at 121 (emphasis added). As with section 374, therefore, we conclude that nothing in section 375 was meant to constrain preexisting executive branch authority to use the military in the enforcement of the laws.

In our view, this authority flows directly from the Constitution itself. As discussed above, the Constitution charges the President with the duty to execute the laws, and absent valid statutory constraints, it provides him with the means to see to their execution, including, where necessary, the use of military forces. *See supra* pp. 331-34. As we have concluded above, the President's constitutional power to employ the military in the execution of the laws outside the territorial jurisdiction of the United States is in no way affected by the Posse Comitatus Act. *Id.* Thus, within the terms of section 375, military enforcement of the laws outside the United States is "otherwise authorized by law."

Congress' intent that section 375 not disturb existing executive branch authority to employ the military in law enforcement activities is particularly explicit with respect to the enforcement of narcotics laws. The House Conference Report states explicitly that "[n]othing in this chapter adversely affects the authority of the Attorney General to request assistance from the Department of Defense under the provisions of 21 U.S.C. § 873(b)," which was enacted in 1970 as part of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91-513, tit. II, 84 Stat. 1236, 1272 (1970) ("Controlled Substances Act"). Section 873(b) is presently codified in part E, subchapter I, chapter 13 of title 21, which empowers the Attorney General to call upon the military, among other federal instrumentalities, as necessary to assist him in executing the provisions of the Controlled Substances Act.[14] *See United States v. Harrington*, 681 F.2d 612, 613 n.1 (9th Cir. 1982) ("[T]he Attorney General may request the assistance of other agencies to help enforce federal drug laws."); Memorandum for Daniel Silver, General Counsel, National Security Agency ("NSA"), from John M. Harmon, Assistant Attorney General, Office of Legal Counsel at 2 (Jan. 9, 1979) (Section 873(b) is "an affirmative authorization for all federal agencies, including NSA and the Naval Security Command Group, to assist the Attorney General, or his designee, upon receipt of a legitimate and legal request for aid." (footnote omitted)).[15]

Read together, these provisions in our view provide authority in the Attorney General to call upon the military to assist him in the enforcement of the drug laws outside the territorial jurisdiction of the United States. Because the provisions of the 1981 Act do not extend extraterritorially, such aid could include direct military participation in law enforcement activities such as the apprehension of persons under indictment who are outside the territorial jurisdiction of the United States, or assistance in interdiction efforts on the high seas.

## B. The 1988 Amendments

In 1988, Congress substantially modified the provisions of the 1981 Act applicable to the use of military personnel to assist in the enforcement of

---

[14] Pursuant to 21 U S.C. § 965, the subchapter of title 21 that includes section 873(b) also applies to the subchapter that generally proscribes the import and export of controlled substances. Thus, the Attorney General's power to request assistance from other federal agencies extends to the enforcement of all the significant drug laws of the United States

[15] Consistent with this authority is Executive Order No 11727, 3 C F R. 785 (1971-1975), section 1 of which provides:

> The Attorney General, to the extent permitted by law, is authorized to coordinate all activities of executive branch departments and agencies which are directly related to the enforcement of the laws respecting narcotics and dangerous drugs Each department and agency of the Federal Government shall, upon request and to the extent permitted by law, assist the Attorney General in the performance of functions assigned to him pursuant to this order, and the Attorney General may, in carrying out those functions, utilize the services of any other agencies, Federal and State, as may be available and appropriate

the narcotics, immigration, and tariff laws. *See* Pub. L. No. 100-456, tit. XI, § 1104, 102 Stat. 2042 (1988) (codified at 10 U.S.C. §§ 371-380) ("1988 amendments"). The legislative history surrounding the 1988 amendments indicates that they were designed to "expand the opportunities for military assistance in a manner that is consistent with the requirements of military readiness and the historic relationship between the armed forces and civilian law enforcement activities." H.R. Conf. Rep. No. 989, 100th Cong., 2d Sess. 450 (1988). The amendments reaffirmed and broadened the military's authority to share data obtained during military missions, to lend equipment and facilities, and to train civilian law enforcement personnel. *See* 10 U.S.C. §§ 371-373.

Section 374 was substantially revised to include authorization for aerial reconnaissance by military personnel and the interception of vessels or aircraft "detected outside the land area of the United States for the purposes of communicating with such vessels and aircraft to direct such vessels and aircraft to go to a location designated by appropriate civilian officials." *Id.* § 374(b)(2)(B) & (C) (1988). Subsection 374(c), added by the 1988 Act, provides:

> The Secretary of Defense may, in accordance with other applicable law, make Department of Defense personnel available to any Federal, State, or local civilian law enforcement agency to operate equipment for purposes other than described in paragraph (2) only to the extent that such support does not involve direct participation by such personnel in a civilian law enforcement operation unless such participation is otherwise authorized by law.

*Id.* § 374(c).

As with the version of section 374 enacted by the 1981 Act, section 374(c) must be read in conjunction with the entire statutory scheme. In reenacting section 378, the 1988 amendments reiterated that no additional restrictions on executive branch authority to use the military in enforcement of the laws, beyond those contained in the Posse Comitatus Act, were intended. Since the Posse Comitatus Act does not apply extraterritorially, we conclude that there are no statutory limits on the executive branch's authority to employ the military in law enforcement missions outside the territorial jurisdiction of the United States.[16]

---

[16] We note in this regard that the so-called Mansfield Amendment, 22 U.S.C § 2291(c), which prohibits any officer or employee of the United States from "directly effect[ing] any arrest in any foreign country *as part of any foreign police action*, (emphasis added) in connection with narcotics enforcement is inapplicable to the use of the military to enforce the laws of the United States. As its language suggests, the Mansfield Amendment addresses only the participation of United States employees in the internal enforcement activities of foreign countries *See United States v Green*, 671 F2d 46, 53 n 9 (1st Cir)
Continued

341

## III. Department of Defense Regulations

The Department of Defense ("DoD") has promulgated a series of regulations, codified at 32 C.F.R. Part 213 and based on the 1981 Act, to establish uniform DoD policies and procedures with respect to support provided to Federal, State, and local civilian law enforcement efforts. 32 C.F.R. § 213.1. These regulations are somewhat ambiguous as to the restraints they place on the use of the military for overseas law enforcement operations.

As a general matter, the Department's policy is "to cooperate with civilian law enforcement officials to the maximum extent practicable." *Id.* § 213.4. Section 213.10 enumerates specific restrictions on the use of DoD personnel in civilian law enforcement activities, as well as various types of permissible direct assistance that are statutory and other well settled exceptions to the Posse Comitatus Act. Among these approved activities are "actions that are undertaken primarily for a military or foreign affairs purpose," *id.* § 213.10(a)(2)(i)(F), and "[a]ctions taken under express statutory authority to assist officials in the execution of the laws, subject to applicable limitations therein," *id.* § 213.10(a)(2)(ii)(B)(iv). In addition, section 213.10(a)(6) of the regulations provides rules complementing the requirements of section 374 of the 1981 Act, which permits the use of military equipment in certain circumstances outside the land area of the United States. *Id.* 213.10(a)(6)(iii)(C). *See supra* pp. 337-38 & n.12.

These two provisions expressly permit certain extraterritorial use of military resources for civilian law enforcement. As noted above with respect to section 374, *see supra* p. 338, the limited nature of the authorization of extraterritorial law enforcement activities in section 213.10(a)(6)(iii)(C) could be construed to exclude other more extensive extraterritorial activities. This argument might be bolstered by section 213.10(a)(3), which indicates that "[e]xcept as otherwise provided in this enclosure" the Posse Comitatus Act generally prohibits direct military assistance to law enforcement personnel. Moreover, the regulations contain no provision comparable to section 378, which provides that no additional restrictions beyond those imposed by the Posse Comitatus Act were intended. We conclude, however, that these regulations should not be read to prohibit military aid in extraterritorial law enforcement activity.

First, section 213.10(a)(6)(iii)(C) was intended to implement the 1981 Act, which quite clearly *did not* extend the prohibitions of the Posse Comitatus Act extraterritorially. While an agency may bind itself by regu-

---

[16] ( ..continued)
("[T]he legislative history of the provision makes it clear that it was only intended to 'insure that U S personnel do not become involved in sensitive, internal law enforcement operations which could adversely affect U S. relations with that country'") (quoting S. Rep No 94-954 at 55), *cert. denied*, 457 U S. 1135 (1982). The Mansfield Amendment thus has no bearing on the use of United States military personnel to enforce the laws of the United States on the high seas or in foreign territory.

lation beyond specific statutory mandates, *Accardi v. Shaughnessy*, 347 U.S. 260, 266-67 (1954), it would be somewhat anomalous to conclude that the Department of Defense had done so here, particularly in light of the general policy statement in section 213.4 of the regulations to "cooperate with civilian law enforcement officials to the maximum extent practicable," and the position of the Judge Advocate General's Office on extraterritorial law enforcement activity. *See supra* p. 336.

Second, the substance of section 213.10(a)(6)(iii)(C) has been substantially undermined by the expansion of statutory authority in the 1988 amendments to section 374. Among other things, those amendments eliminated the requirement that the Attorney General and the Secretary of Defense determine that an emergency circumstance exists before military assistance may be granted. *See* 10 U.S.C. § 374(b)(2)(E).[17] We see little merit to an argument that restrictions on military assistance contained in outdated regulations must be assumed to apply extraterritorially.

In any event, we do not believe the regulations could operate to constrain the Attorney General's authority under 21 U.S.C. § 873(b) to enlist the military's assistance in the enforcement of the drug laws.[18] *See supra* p. 340. In addition, a significant constitutional question would be raised if the regulations were read to prevent the President from issuing direct instructions, based on his constitutional powers as Chief Executive and Commander-in-Chief, to the Secretary of Defense to assist civilian authorities in law enforcement activities outside the jurisdiction of the United States. *See supra* pp. 331-34. In the respects noted above, however, the regulations can be read as imposing restrictions on extraterritorial use of military forces, and numerous courts have treated the Department of Defense regulations as law binding the agency in its conduct of law enforcement activity. *See United States v. Del Prado-Montero*, 740 F.2d 113 (1st Cir.), *cert. denied*, 469 U.S. 1021 (1984); *United States v. Roberts*, 779 F.2d 565 (9th Cir.), *cert. denied*, 479 U.S. 839 (1986); *United States v. Yunis*, 681 F. Supp. 891 (D.D.C. 1988), *aff'd*, 924 F.2d 1086 (1991).

In sum, the Department of Defense regulations contained in section 213.10(a)(6)(iii)(C) are ambiguous, at best, as to the restraints they place on the use of Department of Defense personnel to enforce the laws outside the territorial jurisdiction of the United States. Although we think the better interpretation of the regulations is to construe them consis-

---

[17] Present section 374 provides that Department of Defense personnel may operate equipment for "the transportation of civilian law enforcement personnel" and for "the operation of a base of operations for civilian law enforcement personnel," outside the United States subject to "joint approval by the Secretary of Defense, the Attorney General, and the Secretary of State." 10 U.S.C. § 374(b)(2)(E). No requirement of a finding of the existence of "an emergency circumstance" is required.

[18] Indeed, the Attorney General's authority under 21 U.S C § 873(b) would seem to fit squarely within the exception in section 213.10(a)(2)(ii)(B)(iv) to the general prohibition on direct enforcement activities for "[a]ctions taken under express statutory authority to assist officials in the execution of the laws, subject to applicable limitations therein."

tently with the statutory provisions, until they are amended, some ambiguity will remain concerning the legality under the regulations of the use of military personnel to enforce the laws overseas.

## IV. Conclusion

We conclude that the Posse Comitatus Act does not apply outside the territory of the United States. Neither the language, history, nor legislative history of the Act suggests that Congress intended the restrictions on use of the military in civilian law enforcement to apply extraterritorially. Under these circumstances, established rules of statutory construction impose a presumption that the Act be construed as having only domestic effect. Such a construction also is necessary to enable certain criminal laws to be executed and to avoid unwarranted restraints on the President's constitutional powers. Although some language in the Department of Defense regulations suggests that certain restrictions on the use of military assistance apply outside the land area of the United States, we believe the better view is to read those regulations consistently with provisions in the underlying statute stating that no limitations beyond those imposed by the Posse Comitatus Act were intended to be enacted. Until the regulations are revised to so provide, however, some uncertainty about the scope of the regulations will remain.

WILLIAM P. BARR
*Assistant Attorney General*
*Office of Legal Counsel*

344